IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THOMAS SANDYS, Derivatively on Behalf of ZYNGA INC., | § § § | No. 157, 2016 |
| Plaintiff below, Appellant, | § § § | Court Below: Court of Chancery of the State of |
| v. | § § | Delaware |
| MARK J. PINCUS, REGINALD D. DAVIS, CADIR B. LEE, JOHN SCHAPPERT, DAVID M. WEHNER, MARK VRANESH, WILLIAM GORDON, REID HOFFMAN, JEFFREY KATZENBERG, STANLEY J. MERESMAN, SUNIL PAUL and OWEN VAN NATTA, | § § § § § § § | C.A. No. 9512-CB |
| Defendants below, Appellees, | § § | |
| and | § § | |
| ZYNGA INC., a Delaware Corporation, | § § § | |
| Nominal Defendant below, Appellee. | § § § | |

Submitted: October 13, 2016
Decided: December 5, 2016

Before **STRINE**, Chief Justice; **HOLLAND**, **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **REVERSED.**

Norman M. Monhait, Esquire, P. Bradford deLeeuw, Esquire, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware; Jeffrey S. Abraham, Esquire, (*Argued*), Philip T. Taylor, Esquire, Abraham, Fruchter & Twersky, LLP, New York, New York, Attorneys for Plaintiff-Below, Appellant, Thomas Sandys.

Elena C. Norman, Esquire, Nicholas J. Rohrer, Esquire, Paul J. Loughman, Esquire, Young Conaway Stargatt & Taylor LLP, Wilmington, Delaware; Jordan Eth, Esquire, Anna Erickson White, Esquire, (*Argued*), Morrison & Foerster LLP, San Francisco, California, Attorneys for Defendants-Below, Appellees, Mark J. Pincus, Reginald D. Davis, Cadir B. Lee, John Schappert, David M. Wehner, Mark Vranesh, and Owen Van Natta, and Zynga Inc.

Bradley D. Sorrels, Esquire, Jessica A Montellese, Esquire, Wilson Sonsini Goodrich & Rosati, P.C., Wilmington, Delaware; Steven M. Schatz, Esquire, (*Argued*), Nina (Nicki) Locker, Esquire, Benjamin M. Crosson, Esquire, Wilson Sonsini Goodrich & Rosati, P.C., Palo Alto, California, Attorneys for Defendants-Below, Appellees, William Gordon, Reid Hoffman, Jeffrey Katzenberg, Stanley J. Meresman, and Sunil Paul.

**STRINE**, Chief Justice, for the Majority:

# I.

This appeal in a derivative suit brought by a stockholder of Zynga, Inc. turns on whether the Court of Chancery correctly found that a majority of the Zynga board could impartially consider a demand and thus correctly dismissed the complaint for failure to plead demand excusal under Court of Chancery Rule 23.1. This case again highlights the wisdom of the representative plaintiff bar heeding the repeated admonitions of this Court and the Court of Chancery to make a diligent pre-suit investigation into the board's independence so that a complaint can be filed satisfying the burden to plead particularized facts supporting demand excusal. Here, the derivative plaintiff's lack of diligence compounded the already difficult task that the Court of Chancery faces when making close calls about pleading stage independence. Fortunately for the derivative plaintiff, however, he was able to plead particularized facts regarding three directors that create a reasonable doubt that these directors can impartially consider a demand. First, the plaintiff pled a powerful and unusual fact about one director's relationship to Zynga's former CEO and controlling stockholder which creates a reasonable doubt that she can impartially consider a demand adverse to his interests. That fact is that the controlling stockholder and the director and her husband co-own an unusual asset, an airplane, which is suggestive of an extremely intimate personal friendship between their families. Second, the plaintiff pled that two other

directors are partners at a prominent venture capital firm and that they and their firm not only control 9.2% of Zynga's equity as a result of being early-stage investors, but have other interlocking relationships with the controller and another selling stockholder outside of Zynga. Although it is true that entrepreneurs like the controller need access to venture capital, it is also true that venture capitalists compete to fund the best entrepreneurs and that these relationships can generate ongoing economic opportunities. There is nothing wrong with that, as that is how commerce often proceeds, but these relationships can give rise to human motivations compromising the participants' ability to act impartially toward each other on a matter of material importance. Perhaps for that reason, the Zynga board itself determined that these two directors did not qualify as independent under the NASDAQ rules, which have a bottom line standard that a director is not independent if she has "a relationship which, in the opinion of the Company's board of directors, would interfere with the exercise of independent judgment . . . ."[1] Although the plaintiff's lack of diligence made the determination as to these directors perhaps closer than necessary, in our view, the combination of these facts creates a pleading stage reasonable doubt as to the ability of these directors to act independently on a demand adverse to the controller's interests. When these three directors are considered incapable of impartially considering a

---

[1] NASDAQ Marketplace Rule 5605(a)(2).

demand, a majority of the nine member Zynga board is compromised for Rule 23.1 purposes and demand is excused. Thus, the dismissal of the complaint is reversed.

## II.

The plaintiff alleges two derivative claims, each centering on allegations that certain top managers and directors at Zynga—including its former CEO, Chairman, and controlling stockholder Mark Pincus—were given an exemption to the company's standing rule preventing sales by insiders until three days after an earnings announcement. According to the plaintiff, top Zynga insiders sold 20.3 million shares of stock for $236.7 million as part of a secondary offering before Zynga's April 26, 2012 earnings announcement, an announcement that the plaintiff contends involved information that placed downward pressure on Zynga's stock price.[2] The plaintiff alleges that these insiders sold their shares at $12.00 per share and that, immediately after the earnings announcement, the market price dropped 9.6% to $8.52. Three months later, following the release of additional negative information, which the plaintiff alleges was known by Zynga management and the board when it granted the exemption, Zynga's market price declined to $3.18, a decrease of 73.5% from the $12.00 per share offering price. In this suit, the plaintiff alleges that the insiders who participated in the sale breached their

---

[2] These shares were sold as part of a secondary public offering that increased Zynga's public float, which at that time consisted of fewer than 150 million shares, compared to approximately 688 million shares held by Zynga directors, officers, employees, former employees, and other pre-IPO investors. Appellee's Answering Br. at 7.

3

fiduciary duties by misusing confidential information when they sold their shares while in possession of adverse, material non-public information and also asserts a duty of loyalty claim against the directors who approved the sale.

The defendants moved to dismiss this action under Court of Chancery Rule 23.1 for plaintiff's failure to make a pre-suit demand on the board.[3] The Court of Chancery's decision turned on its evaluation of the pleading stage independence of the Zynga board at the time the complaint was filed,[4] which was comprised of the following nine directors: Mark Pincus, Reid Hoffman, Jeffrey Katzenberg, Stanley J. Meresman, William Gordon, John Doerr, Ellen Siminoff, Sunil Paul, and Don Mattrick. In addressing demand excusal, the Court of Chancery applied the standard set forth in this Court's decision in *Rales v. Blasband*[5] to determine if at least five of Zynga's nine directors were independent for pleading stage purposes. The Court of Chancery first determined that the two directors who participated in the transaction, Pincus and Hoffman, were interested in the transaction, and therefore could not impartially consider a demand.[6] The Court of Chancery then

---

[3] *See* Ct. Ch. R. 23.1 ("The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort.").

[4] *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993) (noting that demand futility is assessed at the time the complaint is filed).

[5] *Id.*

[6] Although the defendants assert that the Court of Chancery did not reach this conclusion, we disagree. The Court of Chancery conducted a simple analysis finding Pincus and Hoffman interested in the transaction when it stated:

examined the independence of directors Katzenberg, Meresman, Gordon, Doerr, and Siminoff. The Court of Chancery found that all five of these directors were independent and thus, that demand was not excused. The Court of Chancery did not analyze the independence of directors Paul and Mattrick. But, the Court of Chancery did include a footnote stating that it "would reach the same conclusion regarding Paul, who did not participate in the Secondary Offering or even vote to approve it."[7] At the time of the complaint, Mattrick had replaced Pincus as CEO. The remaining seven directors were outsiders.

The Court of Chancery properly determined that directors Pincus and Hoffman were interested in the transaction. Furthermore, Mattrick is Zynga's CEO. Zynga's controlling stockholder, Pincus, is interested in the transaction under attack, and therefore, Mattrick cannot be considered independent. Thus, the question for us is whether the plaintiff pled particularized facts that create a reasonable doubt about the independence of two of the remaining six Zynga

---

Because Hoffman and Pincus are the only members of the Demand Board who sold shares in the Secondary Offering and received a benefit from the alleged wrongdoing, they are the only members of the Demand Board who face potential liability under *Brophy*. Consequently, the other seven directors on the Demand Board are not interested in Count I for purposes of the *Rales* test, and I need only to determine whether plaintiff has created a reasonable doubt about their independence.

*Sandys v. Pincus*, 2016 WL 769999, at *7 (Del. Ch. Feb. 29, 2016).

[7] *Id.* at *14 n.70.

directors.[8]  If the plaintiff convinces us that he did, then we must reverse the Court of Chancery's dismissal under Rule 23.1.  We review this question *de novo*.[9]

On appeal, neither party contests the applicability of the *Rales* standard employed by the Court of Chancery.  Therefore, we use it in our analysis to determine whether the Court of Chancery erred in finding that a majority of the board was independent for pleading stage purposes.  To plead demand excusal under *Rales*, the plaintiff must plead particularized factual allegations that "create a reasonable doubt that, as of the time the complaint [was] filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[10]  At the pleading stage, a lack of independence turns on "whether the plaintiffs have pled facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party."[11]  "Our law requires that all the pled facts regarding a director's relationship to the interested party be considered in full context in making the, admittedly imprecise, pleading stage determination of

---

[8] The plaintiff does not dispute the Court of Chancery's finding that directors Katzenberg and Meresman are independent.
[9] *Del. Cty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1021 (Del. 2015); *Beam v. Stewart,* 845 A.2d 1040, 1048 (Del. 2004).
[10] *Rales*, 634 A.2d at 934.
[11] *Sanchez*, 124 A.3d at 1024 n.25.

independence."[12]  "[A]lthough the plaintiff is bound to plead particularized facts in pleading a derivative complaint, so too is the court bound to draw all inferences from those particularized facts in favor of the plaintiff, not the defendant, when dismissal of a derivative complaint is sought."[13]

For many years, this Court and the Court of Chancery have advised derivative plaintiffs to take seriously their obligations to plead particularized facts justifying demand excusal.[14]  This case presents the unusual situation where a plaintiff who sought books and records to plead his complaint somehow only asked for records relating to the transaction he sought to redress and did not seek any books and records bearing on the independence of the board.[15]  Furthermore, although purporting to be a fitting representative for investors in a technology company, the plaintiff appears to have forgotten that one of the most obvious tools at hand is the rich body of information that now can be obtained by conducting an internet search.[16]  As a result of the plaintiff's failure, he made the task of the Court

---

[12] *Id*. at 1022.

[13] *Id.*

[14] *See, e.g.*, *Rales,* 634 A.2d at 934 n.10; *Brehm v. Eisner*, 746 A.2d 244, 266-67 (Del. 2000); *Guttman v. Huang*, 823 A.2d 492, 504 (Del. Ch. 2003); *Ash v. McCall*, 2000 WL 1370341, at *15 n.56 (Del. Ch. Sept. 15, 2000).

[15] Verified Complaint Pursuant to 8 *Del. C.* § 220, *Sandys v. Zynga Inc.*, C.A. No. 8450-ML (Del. Ch.).

[16] Of course, as with any source of information, including a traditional library, the internet should be used with care.  Ultimately, any fact pleading has to be based on a source that provides a good faith basis for asserting a fact.  Thus, as with any search, an internet search will only have utility if it generates information of a reliable nature.  But with that key caveat in mind, we can take judicial notice that internet searches can generate articles in reputable newspapers and journals,

of Chancery more difficult than was necessary and hazarded an adverse result for those he seeks to represent. Despite that failure, the plaintiff did plead some particularized facts and we are bound to draw all reasonable inferences from those facts in the plaintiff's favor in determining whether dismissal was appropriately granted.[17]

## A.

In conducting this analysis, we first focus on director Ellen Siminoff. The Court of Chancery found that Siminoff was independent even though she and her husband co-own a private airplane[18] with Pincus.[19] In his complaint, the plaintiff pled that "Siminoff and her husband have an existing business relationship with defendant Pincus as co-owners of a private airplane,"[20] and in his briefing in the Court of Chancery, the plaintiff characterized Siminoff as a "close family friend" of Pincus,[21] which the Court of Chancery took into account as if it was a pled

---

postings on official company websites, and information on university websites that can be the source of reliable information.

[17] *Sanchez*, 124 A.3d at 1022.

[18] During oral arguments, there was a question raised by the Court over whether this was an airplane or a jet. The plaintiff's lawyer proceeded to characterize it as a jet during his rebuttal. But, Zynga's Proxy Statement and the plaintiff's complaint both state "private airplane," and therefore we call it an airplane. Regardless of whether it is an airplane or a jet, we reach the same conclusion.

[19] Zynga, Inc. Definitive Proxy Statement (Form 14A), at 1 (Apr. 25, 2013) (noting that Ms. Siminoff, her spouse, and Mr. Pincus "co-own a small private airplane, which was not used for Company travel").

[20] App. to Appellant's Opening Br. at A071 (Verified Shareholder Derivative Complaint).

[21] *Id.* at A145.

fact.[22]  Had the plaintiff been more thorough in his research by using all of the "tools at hand,"[23] including the tool provided by the company whose name has become a verb—or another internet search engine—he likely would have discovered more information about Siminoff's relationship with Pincus.  Not only was the plaintiff's research cursory, the plaintiff did not focus on the most likely inference from the co-ownership of the private airplane between Pincus and Siminoff—which is not that the private airplane was a business venture—but that it signaled an extremely close, personal bond between Pincus and Siminoff, and between their families.  Thus, the Court of Chancery was stuck with the limited factual allegations made by the plaintiff and, citing our decision in *Beam v. Stewart*,[24] the Court of Chancery determined that these allegations of friendship and shared ownership of an asset were not enough to create a reasonable pleading

---

[22] *Sandys*, 2016 WL 769999, at *8.

[23] *See, e.g.*, *Rales v. Blasband*, 634 A.2d 927, 935 n.10 (1993).  This Court noted that although derivative plaintiffs may believe it is difficult to meet the particularization requirement in their pleadings:

> [They] have many avenues available to obtain information bearing on the subject of their claims. For example, there is a variety of public sources from which the details of a corporate act may be discovered, including the media and governmental agencies such as the Securities and Exchange Commission. In addition, a stockholder who has met the procedural requirements and has shown a specific proper purpose may use the summary procedure embodied in 8 *Del. C.* § 220 to investigate the possibility of corporate wrongdoing.

*Id.*

[24] 845 A.2d 1040 (Del. 2004).

stage inference that Siminoff could not act impartially in considering a demand implicating Pincus.[25]

Although we acknowledge the difficult position that the Court of Chancery was placed in, we reach a different conclusion. The Siminoff and Pincus families own an airplane together. Although the plaintiff made some strained arguments below, it made one argument in relation to this unusual fact that does create a pleading stage inference that Siminoff cannot act independently of Pincus. That argument is that owning an airplane together is not a common thing, and suggests that the Pincus and Siminoff families are extremely close to each other and are among each other's most important and intimate friends. Co-ownership of a private plane involves a partnership in a personal asset that is not only very expensive, but that also requires close cooperation in use, which is suggestive of detailed planning indicative of a continuing, close personal friendship. In fact, it is suggestive of the type of very close personal relationship that, like family ties, one would expect to heavily influence a human's ability to exercise impartial judgment.[26] As we noted recently, although a plaintiff has a pleading stage burden

---

[25] *Sandys*, 2016 WL 769999, at *8.

[26] *See In re MFW S'holders Litig.*, 67 A.3d 496, 509 n.37 (Del. Ch. 2013), *aff'd sub nom. Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014) (noting that if a friendship "was one where the parties had served as each other's maids of honor, had been each other's college roommates, shared a beach house with their families each summer for a decade, and are as thick as blood relations, that context would be different from parties who occasionally had dinner over the years, go to some of the same parties and gatherings annually, and call themselves 'friends'"); *Del. Cty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1022 (Del. 2015) (finding that a director

10

that is elevated in the demand excusal context, that standard does not require a plaintiff to plead a detailed calendar of social interaction to prove that directors have a very substantial personal relationship rendering them unable to act independently of each other.[27] A plaintiff is only required to plead facts supporting an inference[28]—or in the words of *Rales*, "create a reasonable doubt"[29]—that a director cannot act impartially. Here, the facts support an inference that Siminoff would not be able to act impartially when deciding whether to move forward with a suit implicating a very close friend with whom she and her husband co-own a private plane.

### B.

We next turn to the plaintiff's argument that he created a reasonable doubt that two other directors—William Gordon and John Doerr—are not independent for pleading stage purposes. In his complaint, the plaintiff included the following facts pertaining to Gordon and Doerr: both are partners at Kleiner Perkins Caufield & Byers,[30] which controls approximately 9.2% of Zynga's equity;[31] and, Kleiner Perkins is also invested in One Kings Lane, a company that Pincus's wife co-

---

was not independent for pleading stage purposes because the director had a friendship of over 50 years with an interested party and the director's primary employment was as an executive of a company over which the interested party had substantial influence).

[27] 124 A.3d at 1020–22.

[28] *Id.* at 1019.

[29] *Rales*, 634 A.2d at 934.

[30] App. to Appellant's Opening Br. at A071 (Verified Shareholder Derivative Complaint).

[31] *Id.* at A020.

11

founded.[32]  Not only that, defendant Reid Hoffman—an outside director of Zynga who was one of the directors and officers given an exemption to sell in the secondary offering—and Kleiner Perkins both have investments in Shopkick, Inc., and Hoffman serves on that company's board along with yet another partner at Kleiner Perkins.[33]  These relationships, suggest the plaintiff, indicate that Gordon and Doerr have a mutually beneficial network of ongoing business relations with Pincus and Hoffman that they are not likely to risk by causing Zynga to sue them. Amplifying this argument, says the plaintiff, is the voice of Gordon's and Doerr's fellow Zynga directors who did not consider them to be independent directors. According to its own public disclosures, the Zynga board determined that Gordon and Doerr do not qualify as independent directors under the NASDAQ Listing Rules.[34]  Importantly, however, Zynga did not disclose why its board made this determination,[35] and the plaintiff failed to request this information in its books and records demand.[36]

Despite these factual allegations, the Court of Chancery found that Gordon and Doerr were independent for pleading stage purposes because the plaintiff failed to specifically allege why Gordon and Doerr lack independence under the

---

[32] *Id.* at A072.
[33] *Id.*
[34] *Id.*
[35] Zynga, Inc. Definitive Proxy Statement (Form 14A), at 1 (Apr. 25, 2013).
[36] Verified Complaint Pursuant to 8 *Del. C.* § 220, *Sandys v. Zynga Inc.*, C.A. No. 8450-ML (Del. Ch.).

NASDAQ rules, and the other circumstances pled by the plaintiff were "insufficient to question their independence under Delaware law."[37] In so ruling, the Court of Chancery seemed to place heavy weight on the presumptive independence of directors under our law.[38] But, to have a derivative suit dismissed on demand excusal grounds because of the presumptive independence of directors whose own colleagues will not accord them the appellation of independence creates cognitive dissonance that our jurisprudence should not ignore.

We agree with the Court of Chancery that the Delaware independence standard is context specific and does not perfectly marry with the standards of the stock exchange in all cases,[39] but the criteria NASDAQ has articulated as bearing on independence are relevant under Delaware law and likely influenced by our law.[40] The NASDAQ rules outline the following list of relationships that automatically preclude a finding of independence:

**(A)** a director who is, or at any time during the past three years was, employed by the Company;

**(B)** a director who accepted or who has a Family Member who accepted any compensation from the Company in excess of $120,000 during any period of twelve consecutive months

---

[37] *Sandys*, 2016 WL 769999, at *10.

[38] *Id.*

[39] *Id.* at *9.

[40] *See In re MFW S'holders Litig.*, 67 A.3d at 510 (noting that stock exchange rules governing director independence "were influenced by experience in Delaware and other states and were the subject of intensive study by expert parties" and "[t]hey cover many of the key factors that tend to bear on independence . . . and they are a useful source for this court to consider when assessing an argument that a director lacks independence").

within the three years preceding the determination of independence, other than the following:

**(i)** compensation for board or board committee service;

**(ii)** compensation paid to a Family Member who is an employee (other than an Executive Officer) of the Company; or

**(iii)** benefits under a tax-qualified retirement plan, or non-discretionary compensation.

Provided, however, that in addition to the requirements contained in this paragraph (B), audit committee members are also subject to additional, more stringent requirements under Rule 5605(c)(2).

**(C)** a director who is a Family Member of an individual who is, or at any time during the past three years was, employed by the Company as an Executive Officer;

**(D)** a director who is, or has a Family Member who is, a partner in, or a controlling Shareholder or an Executive Officer of, any organization to which the Company made, or from which the Company received, payments for property or services in the current or any of the past three fiscal years that exceed 5% of the recipient's consolidated gross revenues for that year, or $200,000, whichever is more, other than the following:

**(i)** payments arising solely from investments in the Company's securities; or

**(ii)** payments under non-discretionary charitable contribution matching programs.

**(E)** a director of the Company who is, or has a Family Member who is, employed as an Executive Officer of another entity where at any time during the past three years any of the

14

Executive Officers of the Company serve on the compensation committee of such other entity; or

**(F)** a director who is, or has a Family Member who is, a current partner of the Company's outside auditor, or was a partner or employee of the Company's outside auditor who worked on the Company's audit at any time during any of the past three years.

**(G)** in the case of an investment company, in lieu of paragraphs (A)-(F), a director who is an "interested person" of the Company as defined in Section 2(a)(19) of the Investment Company Act of 1940, other than in his or her capacity as a member of the board of directors or any board committee.[41]

Most importantly, under the NASDAQ rules there is a fundamental determination that a board must make to classify a director as independent, a determination that is also relevant under our law. The bottom line under the NASDAQ rules is that a director is not independent if she has a "relationship which, in the opinion of the Company's board of directors, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director."[42] The NASDAQ rules' focus on whether directors can act independently of the company or its managers has important relevance to whether they are independent for purposes of Delaware law. Our law is based on the sensible intuition that deference ought to be given to the business judgment of directors whose interests are aligned with those of the company's stockholders.[43] Precisely because of that deference, if our law is to

---

[41] NASDAQ Marketplace Rule 5605(a)(2).
[42] *Id.*
[43] *See Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) ("The business judgment rule is an acknowledgment of the managerial prerogatives of Delaware directors under Section 141(a). It

have integrity, Delaware must be cautious about according deference to directors unable to act with objectivity. To consider directors independent on a Rule 23.1 motion generates understandable skepticism in a high-salience context where that determination can short-circuit a merits determination of a fiduciary duty claim.

We presume that the Zynga board did not lightly classify Gordon and Doerr as having a "relationship which, in the opinion of the Company's board of directors, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director."[44] And, although we do not know the exact reason the board made this determination,[45] we do know this. In the case of a company like Zynga, which has a controlling stockholder, Pincus, who wields 61% of the voting power, if a director cannot be presumed capable of acting independently because the director derives material benefits from her relationship with the company that could weigh on her mind in considering an issue before the board, she necessarily cannot be presumed capable of acting independently of the company's controlling stockholder. That a director sits on a controlled company

_____

is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.").

[44] NASDAQ Marketplace Rule 5605(a)(2).

[45] The Proxy Statement states that "the Board has affirmatively determined that Messrs. Hoffman, Katzenberg, Meresman and Paul and Ms. Siminoff do not have any relationships that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director and that each of these directors is 'independent,'" without further explanation as to why the excluded directors were found to be non-independent. Zynga, Inc. Definitive Proxy Statement (Form 14A), at 1 (Apr. 25, 2013).

16

board is not, and cannot of course, be determinative of director independence at the pleading stage, as that would make the question of independence tautological. But, our courts cannot blind themselves to that reality when considering whether a director on a controlled company board has other ties to the controller beyond her relationship at the controlled company.

As to this reality, we consider it likely that the other facts pled by the plaintiff were taken into account by the Zynga board in determining that Gordon and Doerr were not independent directors. These facts include that: Gordon and Doerr are partners at Kleiner Perkins, which controls 9.2% of Zynga's equity; Kleiner Perkins is also invested in One Kings Lane, a company co-founded by Pincus's wife; and, Hoffman and Kleiner Perkins are both invested in Shopkick, and Hoffman serves on its board with another Kleiner Perkins partner. Of course, the defendants now argue that the relationships among these directors flowed all in one direction and that it is Pincus who is likely beholden to Gordon, Doerr, and Kleiner Perkins for financing. But, the reality is that firms like Kleiner Perkins compete with others to finance talented entrepreneurs like Pincus, and networks arise of repeat players who cut each other into beneficial roles in various situations. There is, of course, nothing at all wrong with that. In fact, it is crucial to commerce and most human relations. But, precisely because of the importance of a mutually beneficial ongoing business relationship, it is reasonable to expect that

17

sort of relationship might have a material effect on the parties' ability to act adversely toward each other. Causing a lawsuit to be brought against another person is no small matter, and is the sort of thing that might plausibly endanger a relationship. When, as here, pled facts suggest such a relationship exists and the company's own board has determined that the directors whose ability to consider a demand impartially is in question cannot be considered independent, a reasonable doubt exists under *Rales*.

Finally, consistent with our prior admonition, why the Zynga board determined that Gordon and Doerr are non-independent is precisely the sort of issue for which the use of a targeted request for books and records would have been helpful to the plaintiff, and thereby to both the Court of Chancery and us. The plaintiff's lack of diligence put the Court of Chancery in a compromised and unfair position to make an important determination regarding these directors' pleading stage independence. That is regrettable, and the plaintiff is fortunate that his failure to do a pre-suit investigation has not resulted in dismissal.

## III.

Because we have determined that the plaintiff has met his pleading stage burden to create a reasonable doubt that a majority of the Zynga board could act impartially in considering a demand implicating Zynga's CEO and controlling

18

stockholder, we reverse the Court of Chancery's dismissal under Rule 23.1 and

remain the matter for further proceedings consistent with this opinion.[46]

---

[46] As indicated, on appeal, the parties raised numerous other issues, including an argument to dismiss the claims against certain defendants under Court of Chancery Rule 12(b)(6) based on this Court's decision in *In re Cornerstone Therapeutics Inc., Stockholder Litig.*, 115 A.3d 1173 (Del. 2015). Although the defendants ask us to reach these questions now, we consider that imprudent and believe that it is important for our Court of Chancery, which is the expert in these cases, to consider these issues in the first instance.

**VALIHURA**, Justice, dissenting:

In a thoughtful forty-two page opinion, the Chancellor determined that the plaintiff had failed to demonstrate that demand would have been futile with respect to the claims in the Complaint. For the reasons set forth herein, I would affirm his well-reasoned decision.

This is a close case, and the plaintiff did not aid his cause in failing to direct a books and records request to the issues bearing on the board's independence.[1] Demand futility required the plaintiff to demonstrate that five of the nine directors were interested or lacked independence. In my view, the Court of Chancery correctly determined that directors Katzenberg, Meresman, Gordon, and Doerr were independent. Plaintiff raises no challenge in this Court as to the independence of directors Katzenberg and Meresman.[2] Although the trial court did not separately analyze director Paul, it did state in a footnote that it "would reach the same conclusion regarding Paul, who did not participate in the Secondary

---

[1] To his credit, his counsel was candid about this at oral argument before this Court. *See* Oral Argument at 5:23, *Sandys v. Pincus*, No. 157, 2016 (Del. Oct. 19, 2016) [hereinafter "Oral Argument"], https://livestream.com/DelawareSupremeCourt/events/6511893/videos/139287026 ("Your Honor, at the time we started the process, a majority of the board had been sellers in the Secondary Offering, so it didn't seem quite as critical at that point in time. I guess with the benefit of hindsight if I had to do it again we would have sought that.").

[2] The Verified Shareholder Derivative Complaint (the "Complaint") contains no allegations regarding Katzenberg's relationship with Hoffman or Pincus. The Complaint's only allegation regarding Meresman's independence is that both he and Hoffman serve on LinkedIn's board. Verified S'holder Derivative Compl. at A71 ¶ 117(i), *Sandys v. Pincus* (Del. Ch. Apr. 4, 2014) [hereinafter "Compl. at A__"], *available at* A12-78. Directors Siminoff and Doerr joined the Board after the events at issue in this action and are not named as defendants; and directors Gordon, Katzenberg, Meresman, and Paul are outside directors who were on the Board during the events at issue, but did not sell any stock in the Secondary Offering.

1

Offering or even vote to approve it."[3]  Because I would conclude that directors Katzenberg, Meresman, Gordon, Doerr, Siminoff, and Paul were independent, I would affirm the Court of Chancery's determination that the plaintiff's complaint failed to create a reasonable doubt that at least five of the nine directors were disinterested or independent for pleading stage purposes.

The plaintiff's arguments as to Gordon and Doerr's alleged lack of independence arise from their positions as partners at Kleiner Perkins Caufield & Byers ("Kleiner Perkins").  The plaintiff alleged that Kleiner Perkins has (i) invested alongside Hoffman in a company co-founded by Pincus's wife; (ii) invested in a company of which Hoffman is a director; and (iii) completed two financings with Hoffman's venture capital firm.[4]  As the Court of Chancery recognized, the plaintiff failed to plead any facts about the size, profits, or materiality to Gordon and Doerr of these investments or interests.  Absent more, the relationships among these venture capitalists and entrepreneurs, as alleged, are not sufficient to raise a reasonable doubt as to Gordon and Doerr's independence.  Thus, I agree with the Chancellor's view that their relationships and overlapping

---

[3] *Sandys v. Pincus*, 2016 WL 769999, at *14 n.70 (Del. Ch. Feb. 29, 2016).
[4] Compl. at A20 ¶¶ 17-18, A68 ¶¶ 114(c), (f), A71 ¶ 117(g), A72 ¶¶ 117(j-k).  The Chancellor appropriately declined to consider other information regarding certain officers' investments in Kleiner Perkins funds.  The plaintiff had raised this information in briefing and in an affidavit containing an excerpt from a public filing that was not incorporated by reference into or attached to the Complaint.

2

investments do not rise to the level of creating a reasonable doubt as to their independence.

As to Gordon's and Doerr's designation as "not independent" under the NASDAQ rules, the Court of Chancery correctly observed that independence under the NASDAQ rules is relevant to our analysis here but not dispositive.[5] The plaintiff candidly acknowledged that he failed to allege why Gordon and Doerr lack independence under NASDAQ rules.[6] As the trial court observed, "neither the proxy statement nor the plaintiff specifies the reason for this[,]"[7] and so it is not clear whether Gordon and Doerr's "non-independent" designation was due to a relationship with Zynga, Pincus, or another executive. It is not difficult to come up with a scenario where a director might be deemed "not independent" under the NASDAQ rules, or NYSE rules, yet deemed independent for demand futility purposes.[8] A request pursuant to 8 *Del. C.* § 220 should have been targeted to this point, as plaintiff concedes.[9]

---

[5] *See, e.g.*, *In re MFW S'holders Litig.*, 67 A.3d 496, 510 (Del. Ch. 2013) ("[T]he fact that directors qualify as independent under the NYSE rules does not mean that they are necessarily independent under our law in particular circumstances." (citing *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 941 n.62 (Del. Ch. 2003))), *aff'd*, 88 A.3d 635 (Del. 2014).

[6] *See* Oral Argument at 12:13.

[7] *Sandys*, 2016 WL 769999, at *9.

[8] *See, e.g.*, *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 61 (Del. Ch. 2015) (comparing the bright-line test for independence set forth in the NYSE rules with the "case-by-case fact specific inquiry based on well-pled factual allegations" required by Delaware law). In *Baiera*, the Court of Chancery concluded that, "[g]iven the peculiarities of the NYSE Rules, the fact that [the director] was not designated as 'independent' under the NYSE Rules in Orbitz's April 2013 proxy statement carries little weight." *Id.* at 62. The court then found that "the factual allegations concerning [that director's] former relationship with Travelport [were]

In the demand futility context, directors are presumed independent,[10] and it is the plaintiff's burden to plead facts "with particularity" showing that a demand on the board would have been futile.[11] Given this burden of proof, the presumption of independence, and the lack of any explanation as to why Gordon and Doerr were identified as "not independent" for NASDAQ purposes, I do not believe that plaintiffs are entitled to an inference that Gordon and Doerr lack independence for purposes of the fact-specific demand futility determination here. This is particularly true given that the allegations concerning Gordon and Doerr's interlocking business relationships fall short of suggesting that they are of a "bias-producing" nature.

As to director Paul, the plaintiff argues that Paul lacked independence from Pincus because they co-founded a company over twenty years ago and Pincus serves in an advisory role and is an investor in Paul's company, SideCar.[12] There are no allegations that demonstrate the materiality or magnitude of the present

---

insufficient in [its] view to cast reasonable doubt on his presumed independence under Delaware law." *Id.*

[9] *See* Oral Argument at 14:00 ("We alleged certain business relationships. It's true we didn't go through the 220 for that one and that was a deficiency in our process. And I guess I fall on my sword for that one.").

[10] *Beam v. Stewart*, 845 A.2d 1040, 1048-49 (Del. 2004) ("The key principle upon which this area of our jurisprudence is based is that the directors are entitled to a *presumption* that they were faithful to their fiduciary duties. In the context of presuit demand, the burden is upon the plaintiff in a derivative action to overcome that presumption." (emphasis in original) (citations omitted)).

[11] Del. Ch. Ct. R. 23.1; *see also Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000) ("Rule 23.1 is not satisfied by conclusory statements or mere notice pleading.").

[12] Compl. at A71 ¶ 117(f).

4

business relationship, which the plaintiff conceded could have been "[s]omewhere between 10 cents and $10 billion."[13]  He also did not dispute the trial court's statement that the company Paul and Pincus co-founded was sold approximately 15 years ago.[14]  Thus, based upon my review of the record,[15] I would conclude that these allegations are insufficient to plead a lack of independence.

Although I would not need to reach issues concerning Siminoff's independence had my view prevailed, I believe that a few points are worth making. The sum total of the allegations as to Siminoff's alleged lack of independence appear in paragraph 117(h) of the Complaint, which states that "Siminoff and her husband have an existing *business relationship* with defendant Pincus as co-owners of a private airplane and, therefore, Siminoff would not initiate litigation against her *business partner* defendant Pincus as it would substantially and irreparably harm their ongoing *business relationship*."[16]

Before the trial court, both parties referred to statements in Zynga's public filings with the Securities and Exchange Commission, although the Complaint did

---

[13] Transcript of Oral Argument on Defs.' Mots. to Dismiss & Stay at A410-411 (Tr. 49:23-50:6), *Sandys v. Pincus*, No. 9512-CB (Del. Ch. Nov. 17, 2015), *available at* A362-435.

[14] *Id.* at A410 (Tr. 49:19-22).

[15] *Beam*, 845 A.2d at 1048 ("This Court reviews *de novo* a decision of the Court of Chancery to dismiss a derivative suit under Rule 23.1[,]" and "[t]he scope of this Court's review is plenary." (italics added) (citations omitted)).

[16] Compl. at A71 ¶ 117(h) (emphasis added).

5

not expressly incorporate these statements by reference.[17] In briefing on the defendants' motion to dismiss or stay, the defendants attached a proxy statement in which Zynga disclosed the "relationship between Ms. Siminoff and her spouse and Mr. Pincus, who co-own a small private airplane, which was not used for Company travel."[18] The Chancellor also acknowledged an unsupported reference in the plaintiff's brief describing Siminoff as a "close personal friend" of Pincus. At oral argument on the defendants' motion to dismiss, the Chancellor offered counsel for Sandys an opportunity to expand on the nature of the relationship, but counsel was unable to do so.[19]

Given the plaintiff's failure to allege any specific facts as to the materiality of the co-owned asset (apparently a small plane, not a jet),[20] whether there were

[17] *E.g.*, Zynga Inc., Definitive Proxy Statement (Form 14A) (Apr. 25, 2013), *excerpt available at* B210-21; Zynga Inc., Prospectus (Mar. 29, 2012), *excerpt available at* B125-60.

[18] Zynga Inc., Definitive Proxy Statement (Form 14A), at 1 (Apr. 25, 2013), *excerpt available at* B210-21.

[19] Transcript of Oral Argument on Defs.' Mots. to Dismiss & Stay at A410 (Tr. 49:7-16).

[20] Zynga Inc., Definitive Proxy Statement (Form 14A), at 1 (Apr. 25, 2013), *excerpt available at* B210-21. Plaintiff's counsel referred to the plane as a "jet" during argument before this Court. *See* Oral Argument at 42:35 ("Your Honor I know you faulted Plaintiff for not doing a more complete books and records, but in the context of this case Defendants placed into the record many of the facts in the form of a proxy statement and a registration statement. And in the argument down below I did invite the Chancellor to look at all the facts in the registration statement and the proxy and both sides cited to those facts. So -- that it's a plane or a jet, the fact that it is a jet is properly before the Court just based upon the Defendants putting that document before the Court, to the extent there is a difference between a plane and a jet."). The proxy statement does not refer to the plane as a "jet," as the Majority acknowledges. *See* Majority Op. at 8 n.18. At oral argument, when asked whether the plane is a $40,000 Piper Cub or a $40 million Gulfstream jet, counsel for plaintiff merely responded that he never considered that the plane could be a smaller plane "given the positions of these individuals" and that he thought "it's reasonable to infer that a private plane is a relatively weighty purchase and a weighty investment." Oral Argument at 10:00.

other owners, or the nature of the Siminoff/Pincus relationship,[21] I am sympathetic to the Chancellor's view that "Plaintiff's allegations concerning co-ownership of an asset and friendship do not reveal a sufficiently deep personal connection to Pincus so as to raise a reasonable doubt about Siminoff's independence from Pincus."[22] Given the plaintiff's burden, the Chancellor's decision to err on the dismissal side of this fault line is not unreasonable.

The Majority states that "the most likely inference" to draw from co-ownership of the small plane is "not that the private airplane was a *business venture*" but that there was "an extremely close, personal bond between Pincus and Siminoff" and that "the Pincus and Siminoff families are extremely close to each other and are among each other's most important and intimate friends."[23] I respectfully disagree given that the plaintiff has chosen to plead only a *business relationship*. Nothing more is alleged, let alone facts suggesting that kind of familial loyalty and intimate friendship.

To render a director unable to consider demand, a relationship must be of a "bias-producing nature."[24] In *Beam*, this Court reaffirmed that a *reasonable* inference cannot be made that a particular friendship raises a reasonable doubt

---

[21] *See* Compl. at A71 ¶ 117(h).
[22] *Sandys*, 2016 WL 769999, at *8.
[23] Majority Op. at 9-10 (emphasis added).
[24] *Beam*, 845 A.2d at 1050.

"without specific factual allegations to support such a conclusion."[25]  In *Beam*, this Court affirmed dismissal of a complaint that had pled that certain directors were a "longtime personal friend," a "longstanding friend[,]" and had a "longstanding personal relationship with defendant Stewart."[26]  Given this plaintiff's decision to allege the existence of a business relationship only, he is left to argue that co-ownership of a small airplane is simply the kind of fact that, in and of itself, creates a reasonable doubt as to Siminoff's independence from Pincus.  This is a close call.  Although it may be reasonable to infer some kind of collaborative relationship given the nature of the asset, I do not believe the bare allegation in the Complaint rises to the level of creating a reasonable doubt as to Siminoff's ability to carry out her fiduciary duties, to properly consider a demand, and to put at risk her reputation by disregarding her duties.

Thus, this case stands in contrast to *Sanchez*,[27] for example, where the plaintiff pled that the director had a fifty-year friendship with the interested party, that the director's primary employment (and that of his brother) was as an executive of a company over which the interested party had substantial influence, and the director made thirty to forty percent of his annual income from his

---

[25] *Id.* (quoting *Beam v. Stewart*, 833 A.2d 961, 979 (Del. Ch. 2003)) (internal quotation marks omitted).

[26] *Id.* at 1045-47.

[27] *Del. Cnty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017 (Del. 2015).

directorship.[28]  Here, the bare reference to a "close friendship" appears only as an unsupported assertion in a brief.[29]  This unsupported and unverified reference should not be considered and should not serve as a basis upon which to draw any inferences.  For me, this is not a mere technicality.  Court of Chancery Rule 3(aa) requires that all complaints "be verified."[30]  This means that every pleading "shall be under oath or affirmation by the party filing such pleading that the matter contained therein insofar as it concerns the party's act and deed is true, and so far as relates to the act and deed of any other person, is believed by the party to be true."[31]  Unverified and unsupported statements in a brief should not be considered as if they were pleaded facts.

In *Sanchez*, we warned that, "[i]t is not fair to the defendants, to the Court of Chancery, or to this Court, nor is it proper under the rules of either court, for the plaintiffs to put facts outside the complaint before us."[32]  We further cautioned that "this approach hazards dismissal with prejudice on the basis of a record the plaintiffs had the fair chance to shape and that omitted facts they could have, but failed to, plead."[33]  Here, the plaintiff failed to heed that warning and unnecessarily complicated the task of both courts in exercising their best efforts to reach a just

---

[28] *Id.* at 1020-21.
[29] Brief of Pl. in Opp'n to Defs.' Mots. to Stay or Dismiss at A145, *Sandys v. Pincus*, No. 9512-CB (Del. Ch. Apr. 17, 2015), *available at* A82-150.
[30] Del. Ct. Ch. R. 3(aa).
[31] *Id.*
[32] *Sanchez*, 124 A.3d at 1021 n.14.
[33] *Id.*

9

result.[34]   Even assuming that our law cannot "ignore the social nature of humans[,]"[35] there is no equity here in asking the reviewing courts to speculate that the pleaded Siminoff/Pincus business relationship is of such a nature to render her beholden to him or so under his influence that her directorial discretion is sterilized.

Accordingly, because I would affirm the Court of Chancery's decision, I respectfully dissent.

---

[34] Finally, regarding the Majority's repeated suggestions (both in its Opinion and at oral argument) that plaintiffs should search the internet for facts in fashioning a complaint, *see, e.g.*, Oral Argument at 6:05, 14:00, 21:10, although perhaps useful on some level, internet searches likely are not, in most cases, an adequate substitute for demands made pursuant to 8 *Del. C.* § 220—particularly in terms of the reliability and trustworthiness of information discovered.  Of course, a court cannot engage in independent fact-finding, on the internet or otherwise, and the Majority is correct that the Court of Chancery was stuck with the limited factual allegations made by the plaintiff—and so is this Court.  The Majority suggests that, had the plaintiff undertaken an internet search, "he likely would have discovered more information about Siminoff's relationship with Pincus."  Majority Op. at 9; *see also* Oral Argument at 21:30.  But the Majority never identifies what information likely would have been discovered.  Whatever it may be, it can have no bearing on our disposition since the record on appeal before us consists of "the original papers and exhibits" only.  Del. Sup. Ct. R. 9(a); *see Tribbitt v. Tribbitt*, 963 A.2d 1128, 1131 (Del. 2008) (observing that, "while a judge may take judicial notice of a fact outside the record, that fact must not be subject to reasonable dispute and the parties must be given prior notice and an opportunity to challenge judicial notice of that fact" (citations omitted)); *Barks v. Herzberg*, 206 A.2d 507, 509 (Del. 1965); Del. R. Evid. 201(e) ("A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed.  In the absence of prior notification, the request may be made after judicial notice has been taken.").

[35] *Oracle*, 824 A.2d at 938.