# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| BUTTONWOOD TREE VALUE PARTNERS, L.P., a California Limited Partnership and MITCHELL PARTNERS L.P., a California Limited Partnership, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> R. L. POLK & CO., INC., STEPHEN R. POLK (individually and on behalf of a Defendant Class of similarly situated persons), NANCY K. POLK, KATHERINE POLK OSBORNE, DAVID COLE, RICK INATOME, CHARLES MCCLURE, J. MICHAEL MOORE, RLP & C HOLDING, INC., RLP MERGER CO., STOUT RISIUS ROSS, INC., and HONIGMAN MILLER SCHWARTZ AND COHN LLP, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) C.A. No. 9250-VCG ) <u>CLASS ACTION</u> ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## <u>MEMORANDUM OPINION</u>

Date Submitted: May 30, 2017
Date Decided: July 24, 2017

R. Bruce McNew, of COOCH AND TAYLOR, P.A., Wilmington, Delaware and THE MCNEW LAW FIRM, LLC, Wilmington, Delaware, *Attorney for Plaintiffs*.

David A. Dorey, of BLANK ROME LLP, Wilmington, Delaware; OF COUNSEL: Christopher M. Mason, of NIXON PEABODY LLP, New York, New York; Carolyn G. Nussbaum, of NIXON PEABODY LLP, Rochester, New York, *Attorneys for Polk Defendants*.

Michael F. Duggan and Matthew R. Hindley, of MARKS, O'NEILL, O'BRIEN, DOHERTY & KELLY, P.C., Wilmington, Delaware, *Attorneys for Defendant Stout Risius Ross, Inc*.

Gregory P. Williams, Anne C. Foster, Kevin M. Gallagher, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *Attorneys for Defendant Honigman Miller Schwartz and Cohn LLP*.

GLASSCOCK, Vice Chancellor

The value of a corporation today can be significantly different from its value as of a year or two past, and a stockholder who has sold stock last year can generally not effectively point to a contemporary valuation to complain that the consideration he received was inadequate. That is essentially the gravamen of the Plaintiffs' Complaint here—they sold stock of R. L. Polk and Co., Inc. ("Polk" or the "Company") to the Company in a self-tender, and received less than stockholders who did not tender received approximately two years later in a cash-out merger. The Defendants—including directors of Polk and its financial and legal advisors in the self-tender—have moved to dismiss. As unpersuasive as the premise above appears, under the particular facts pled here, the Complaint states a cause of action against the Defendants allied with the family of the founder of the Company (the "Polk Family").

These facts include that the Polk Family collectively owned better than 90% of the common stock of Polk; that directors allied with the Polk Family exercised that collective power as a control block; that they engineered a self-tender in a way that maintained their degree of control; that they set the price through use of a financial advisor that also did work for Polk Family members; and that within around two years of the self-tender, remaining stockholders had received extraordinary dividends amounting to one third of the self-tender price, *together with merger consideration of 300% of the self-tender price.* Under those facts, the burden is on

1

the controller defendants to demonstrate that the self-tender transaction was entirely fair as of the time made. The motion to dismiss must be denied, therefore, with respect to those defendants; with respect to the independent directors of Polk and the other defendants, the motion is granted. My reasoning follows.

## I. BACKGROUND[1]

### A. *The Parties*

Plaintiff Buttonwood Tree Value Partners, L.P. ("Buttonwood") is a California limited partnership that held shares in Defendant Polk at all relevant times.[2] Buttonwood tendered 1,048 shares into the self-tender.[3] Plaintiff Mitchell Partners L.P. ("Mitchell") is a California limited partnership and held shares in Polk at all relevant times.[4] Mitchell "sold 700 shares for $811 per share on or about May 6, 2011 before the close of the Self-Tender and in reliance upon the disclosures in the Offer to Purchase."[5] The Plaintiffs purport to bring this action on behalf of themselves and all others similarly situated.

Defendant Polk is a Delaware corporation with its headquarters in Michigan.[6] The Company has been majority owned and controlled by the Polk Family since its

---

[1] The facts, drawn from Plaintiffs' Second Amended Verified Class Action Complaint (the "Complaint" or "Compl.") and from documents incorporated by reference therein, are presumed true for purposes of evaluating Defendants' Motions to Dismiss.
[2] Compl. ¶ 7.
[3] *Id.*
[4] *Id.* at ¶ 8.
[5] *Id.*
[6] *Id.* at ¶ 9.

2

founding in 1870.[7]  Polk described itself as a company that was privately held, although around 9% of its common shares were owned by public unaffiliated shareholders at all relevant times.[8]  Polk is a consumer marketing information company that collects and interprets data to help customers make informed decisions.[9]  For example, the Company owns Carfax, Inc., "the leading provider of vehicle history reports."[10]  The Company was a named Defendant; I dismissed the Company from this matter at Oral Argument on May 31, 2017.[11]

Defendant Stephen Polk is the great-grandson of the Company's founder and served at all relevant times as Polk's Chairman, CEO, and President.[12]  Stephen Polk has served as a Polk director since 1984.[13]  He is Defendant Nancy K. Polk's brother-in-law and Defendant Katherine Polk Osborne's uncle.  Nancy K. Polk is a Polk Family member, has been a director of Polk since 1989 and at all relevant times here.[14]  Katherine Polk Osborne is a Polk Family member and served as a director on the Polk Board of Directors at all times relevant to this matter.[15]  Defendants

---

[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *See* Oral Arg. Tr. 97:13–14 (May 31, 2017).
[12] Compl. ¶ 10.
[13] *Id.*
[14] *Id.* at ¶ 11.
[15] *Id.* at ¶ 12.

Stephen and Nancy Polk, along with Katherine Polk Osborne, collectively comprise the "Polk Family Directors."

The "Non-Polk Family Directors" (or the "NP Directors"), that is, the directors not members of the Polk Family, consist of Defendants David Cole, Rick Inatome, Charles McClure, and J. Michael Moore.[16] Cole served as a Polk director "from at least 2001 until at least May 2012."[17] Inatome served as a Polk director from at least 1996 to at least May 2012.[18] McClure served as a Polk director from at least 2000 to at least May 2012.[19] J. Michael Moore served as a Polk director from at least 1996 to at least May 2012.[20] The Non-Polk Family Directors and the Polk Family Directors are referred to collectively as the "Individual Defendants" or the "Board."

Defendant Stout Risius Ross, Inc. ("SRR") "is a Michigan company" that "is a global advisory firm that specializes in investment banking, valuation & financial opinions, and dispute advisory & forensic services."[21] SRR served as an advisor to the Company at various times relevant here. Defendant Honigman Miller Schwartz & Cohn LLP ("Honigman") is a Michigan limited liability partnership describing itself as "a leading business law firm serving clients locally, nationally and

---

[16] *Id.* at ¶¶ 17–21.
[17] *Id.* at ¶ 17.
[18] *Id.* at ¶ 18.
[19] *Id.* at ¶ 19.
[20] *Id.* at ¶ 20.
[21] *Id.* at ¶ 24.

internationally."[22] With regards to certain transactions at issue here, Honigman served as counsel to the Company, Polk Family members, Merger Co., and Holding Co.[23] Defendants RLP & C Holding, Inc. ("Holding Co.") and RLP Merger Co. ("Merger Co.") were formed in 2010 and 2013, respectively, to effectuate two different proposed short-form mergers with the Company.[24] Both Holding Co. and Merger Co. were named Defendants; I dismissed them from this action at Oral Argument on May 30, 2017.[25]

*B. Facts Leading to this Litigation*

### 1. The 2008 Self-Tender Exploration

In 2008, the Polk Board began exploring the possibility of a self-tender.[26] To that end, the Board engaged SRR to provide a fairness opinion.[27] In a Board meeting on September 11, 2008, after receiving an oral fairness opinion from SRR and a presentation by Honigman, the Board approved a self-tender at $850 per share.[28] The Company committed $30 million for purchasing the shares in the self-tender.[29] A *draft* of the offer to purchase for this self-tender stated, among other things, "Stephen Polk . . . and Nancy Polk . . . did not vote on the proposed offer due to their

---

[22] *Id.* at ¶ 25.
[23] *Id.*
[24] *Id.* at ¶¶ 13–14.
[25] *See* Oral Arg. Tr. 97:13–14 (May 31, 2017).
[26] Compl. ¶ 47.
[27] *Id.*
[28] *Id.* at ¶ 48.
[29] *Id.*

5

interest in tendering a portion of the shares controlled by each of them."[30]  According to the relevant board meeting minutes, however, Stephen and Nancy Polk did participate in the discussion and vote on this self-tender.[31]  This self-tender, however, never occurred.  The November 13, 2008 board meeting minutes explain that "due to the serious uncertainties and economic decline of the automotive industry," the Board decided to postpone this self-tender indefinitely.[32]

### 2. The 2010 Subchapter S and Short-Form Merger Exploration

In August 2010, "Polk considered engaging SRR" to explore strategic alternatives.[33]  In a meeting on November 11, 2010, the Board "conducted a lengthy discussion of the benefits and detriments of converting" the Company to Subchapter S status.[34]  To convert to Subchapter S status, "a company must have no more than 100 shareholders."[35]  The Company at this time had approximately 127 shareholders.[36]  The Board appointed a committee of Non-Polk Family Directors Cole, Inatome, McClure, and Moore to examine the Subchapter S election more closely (the "Subchapter S Committee").[37]

---

[30] *Id.* at ¶ 49.
[31] *Id.*
[32] *Id.* at ¶ 50.
[33] *Id.* at ¶ 58.
[34] *Id.* at ¶ 51.
[35] *Id.* at ¶ 52.
[36] *Id.*
[37] *Id.* at ¶ 53.

After this November 11 meeting, "Company counsel at Honigman and Stephen Polk began implementing steps to effectuate a short-form merger."[38] Honigman formed Holding Co. on November 16, 2011.[39] Stephen Polk would serve as Holding Co.'s sole officer and sole director.[40] The Complaint admits that one way to reduce the number of shareholders in a corporation, such that it could qualify for Subchapter S status, is to conduct a short-form merger.[41] The Plaintiffs allege here, however, that the "issue of Subchapter S status was, all along, a ruse to justify a transaction to eliminate minority shareholders."[42] At any rate, on November 20, 2010, Stephen Polk, "acting in his capacity as President of the newly-formed Holding Company," hired SRR to perform a valuation analysis to "be used for [Holding Co.'s] management planning purposes in connection with a short form merger of [Polk]."[43] SRR conducted such a valuation analysis from November 2010 to early March 2011.[44] During this same period, according to the Complaint, the Subchapter S Committee "did not perform any investigation as to the advisability of [a Subchapter S election] nor did it even investigate the best manner to achieve such a result."[45] The Subchapter S Committee instead approached a financial advisor—

---

[38] *Id.* at ¶ 54.
[39] *Id.*
[40] *Id.*
[41] *Id.* at ¶ 52.
[42] *Id.* at ¶ 55.
[43] *Id.*
[44] *Id.* at ¶ 56.
[45] *Id.* at ¶ 57.

Donnelly Penman & Partners ("DP&P")—for assistance with a short-form freeze-out merger, but ultimately chose not to use them.[46]  In December 2010, Honigman prepared a legal memorandum regarding a potential sale of the Company.[47]

### 3. The 2011 Self-Tender

At a March 9, 2011 Board meeting, Stephen Polk advised the Board "that the Polk Family was no longer interested in pursuing a short-form merger as a way to restructure the Company."[48]  Stephen Polk instead told the Board that Polk management "was interested in buying back shares of minority shareholders and certain unspecified Polk Family Members."[49]  Stephen Polk also explained to the Board that the Company would use SRR to provide a fairness opinion for this self-tender.[50]  The Complaint details that Jeffrey Risius, of SRR, testified at his deposition that SRR gave the Company a discount on this work because of the previous work SRR had performed for the previous potential short-form merger.[51]  The Complaint then alleges, however, that no discount occurred.[52]  Honigman later "advised SRR to revise its proposed retention letter . . . to include a change 'with the fee to reflect the amount indicated *plus the balance owed by* [*Holding Co.*] *which*

---

[46] *Id.*
[47] *Id.* at ¶ 58.
[48] *Id.* at ¶ 59.
[49] *Id.*
[50] *Id.*
[51] *Id.* at ¶ 60.
[52] *Id.*

*Polk will pay.*'"[53] SRR followed this advice, rolling over Holding Co.'s bill into the bill for the self-tender.[54] Seven days after its initial engagement, SRR gave an oral opinion to the Board that the self-tender offer price of $810 in cash per share "was fair, from a financial point of view, to the tendering shareholders of the Company."[55] SRR later confirmed this oral opinion with a written fairness opinion on March 28, 2011 (the "Fairness Opinion").[56] The Board approved the self-tender on the same day, with the Polk Family Directors participating in the discussion but abstaining from voting.[57]

On March 31, 2011, the Company initiated the self-tender (the "2011 Self-Tender" or the "Self-Tender").[58] The Company offered to purchase up to 37,037 shares of its outstanding common stock at $810 in cash per share.[59] The Self-Tender would expire on May 16, 2011.[60] Before the 2011 Self-Tender, Polk stock traded "in the $600 to $650 per share range."[61] The Company had 536,397 outstanding common stock, thus, the Self-Tender valued the Company at approximately $434.5 million.[62] The Polk Family "owned or controlled 485,377 shares representing 90.5%

---

[53] *Id.* (emphasis in Complaint).
[54] *Id.* at ¶ 68.
[55] *Id.*
[56] *Id.* at ¶ 62.
[57] *Id.* at ¶ 63.
[58] *Id.* at ¶ 61.
[59] *Id.*
[60] *Id.* at ¶ 76.
[61] *Id.* at ¶ 72.
[62] *Id.* at ¶ 64.

9

of the total number of shares outstanding" at the time of the Self-Tender.[63]  The Self-Tender enabled the Polk Family to maintain control of over 90% of the Company even with some members of the Polk Family wishing to sell their shares.[64]  At least some of the members of the Polk Family who wished to sell were two entities controlled by Stephen Polk.[65]

In explaining the Self-Tender, the Offer to Purchase disclosed the following:

[m]embers of the Polk family have expressed interest in tendering shares, owned or controlled by them.  As a result, this share repurchase is intended to provide both Polk family members as well as non-family members an opportunity to tender shares for purchase by the Company. We have been advised that Polk family shareholders intend to tender approximately 10,000 of the shares owned or controlled by them; however, they may tender more or fewer shares.[66]

Regarding business combinations, the Offer to Purchase stated:

[t]he Board did not consider any of the following as there were no firm offers for: (1) the merger or consolidation of the Company with or into another company or vice versa; (2) the sale or other transfer of all or any substantial part of the assets of the Company; or (3) a purchase of our securities that would enable the holder to exercise control of the Company. *In addition, the Polk family has not expressed interest in exploring any such transactions*.[67]

The Offer to Purchase also noted, "[e]xcept as described in this document, we currently have no plans, proposals or negotiations that relate to or would result in:

---

[63] *Id.* at ¶ 72.
[64] *See id.*
[65] *Id.* at ¶ 69.
[66] *Id.* at ¶ 65.
[67] *Id.* at ¶ 66 (emphasis in Complaint).

10

An extraordinary transaction, such as a merger, reorganization or liquidation, involving us or any of our subsidiaries . . . ."[68] However, the Offer to Purchase cautioned that while the Company did not currently have any plans for such extraordinary transactions, it "may undertake or plan actions that relate to or result in one or more" of such extraordinary transactions as it "continue[d] to evaluate opportunities."[69] Concerning SRR, a supplement to the Offer to Purchase explained that

> [p]rior to its engagement by Polk to render its opinion to our Board of Directors, SRR was engaged to perform analytical and valuation work both for Polk and for various members of the Polk family. The work performed for Polk has related primarily to the company's financing and tax strategies, as well as other internal initiatives; *the work for Polk family members has related primarily to personal estate planning.*[70]

The Offer to Purchase did not recommend that stockholders tender,[71] but it did disclose SRR's opinion that the Self-Tender price was fair to stockholders.[72]

### 4. The Sale of the Company and the Special Dividend

In October 2012, fifteen months after the Self-Tender offer expired, the Company retained the investment bank Evercore Partners ("Evercore") "to discuss possible strategic alternatives for the Company."[73] This discussion culminated in

---

[68] *Id.* at ¶ 74.
[69] Polk Defs' Opening Br. Ex. B (the "Offer to Purchase") at 10.
[70] Compl. ¶ 76 (emphasis in Complaint).
[71] Offer to Purchase at 2, 5.
[72] *Id.* at 6–9.
[73] Compl. at ¶ 87.

11

the sale of the Company in June 2013 via short-form merger to IHS, Inc. ("IHS") for $1.4 billion, or $2,675 per share—three times the $810 offer price in the 2011 Self-Tender.[74] In December 2012, before consummating the sale, the Board "declared an extraordinarily high special dividend in the amount of $240 per share."[75] To do so, the Company borrowed $60 million on a line of credit, liquidated $25 million of marketable securities, and paid out $32 million in cash.[76] The Company also had declared two additional extraordinary dividends of $25 per share in the months leading up to hiring Evercore.[77]

*C. Procedural History*

The Plaintiffs filed their Second Amended Verified Class Action Complaint (the "Complaint") on December 19, 2016 alleging five counts. Count I is a claim against the Individual Defendants and the Polk Family Class[78] for breaching their fiduciary duties of care and loyalty by, among other things, standing on both sides of the 2011 Self-Tender, self-dealing, obtaining personal benefits for themselves and failing to disclose all material facts necessary for responding to the 2011 Self-

---

[74] *Id.* at ¶¶ 1, 87.
[75] *Id.* at ¶ 89.
[76] *Id.* at ¶ 90.
[77] *Id.* at ¶ 91.
[78] The Complaint defines the Polk Family Class as "all Polk Family members to the extent shares Polk owned directly or beneficially by them were: (a) controlled by a Polk Director, (b) were part of the control block of Polk shares directed by a Polk Director, (c) supported the actions of the Polk Directors or (d) benefitted from the actions of the Polk Directors challenged herein."[78] *Id.* at ¶ 34.

12

Tender.[79] The Plaintiffs allege that the Polk Family Class acted as the controlling shareholder of Polk through Stephen Polk and the Polk Family Directors and thus owed the Plaintiffs and the Class fiduciary duties.[80] Counts II and III are claims against the Company, Holding Co. and Merger Co., which I dismissed at Oral Argument. Count IV is a claim against SRR for aiding and abetting Stephen Polk and Holding Co. "in consideration of a short-form merger" and the Individual Defendants' alleged breaches of fiduciary duty "in connection with the [2011] Self-Tender and the false and misleading disclosures contained in the Offer to Purchase and the First Supplement to the Offer to Purchase."[81] Count V is a claim against Honigman for aiding and abetting the alleged breaches of fiduciary duty by the Individual Defendants, Merger Co., and Holding Co. in consideration of the short-form merger and in connection with the 2011 Self-Tender and the false and misleading disclosures contained in the Offer to Purchase and the First Supplement to the Offer to Purchase.[82] The Plaintiffs seek damages for the breaches of fiduciary duties alleged above.[83] The Defendants moved to dismiss all Counts and I heard argument on May 30, 2017. My analysis follows.

---

[79] *Id.* at ¶¶ 102–118.
[80] *Id.* at ¶ 107.
[81] *Id.* at ¶ 137.
[82] *Id.* at ¶¶ 140–141.
[83] *Id.* at Prayer for Relief.

## II. ANALYSIS

The Defendants have moved to dismiss the Complaint for failure to state a claim under Court of Chancery Rule 12(b)(6), among other grounds.[84]  "The pleading standards governing the motion to dismiss stage of a proceeding in Delaware . . . are minimal."[85]  When examining a motion for failure to state a claim under Rule 12(b)(6),

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[86]

It may "ultimately prove impossible for the plaintiff to prove his claims at a later stage of a proceeding, but that is not the test to survive a motion to dismiss."[87]  The Complaint here contains a bounty of conclusory allegations; however, at the pleading stage, I find the minimal facts pled sufficient for the Plaintiffs to survive the Defendants' motions to dismiss, at least in part.

---

[84] Various Defendants have also moved to dismiss pursuant to Court of Chancery Rules 8(a), 8(e), 9(b), 12(b)(2), and 41(b).  Given my decision below, I need not reach any arguments under these Rules.

[85] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011).

[86] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotations omitted).

[87] *Cent. Mortg. Co*, 27 A.3d at 536.

*A. The Polk Family and the Polk Family Directors*

"Where a transaction involving self-dealing by a controlling stockholder is challenged, the applicable standard of judicial review is entire fairness."[88] If entire fairness applies, the defendants "bear the ultimate burden of proving that the transaction with the controlling stockholder was entirely fair to the minority stockholders."[89] The Plaintiffs allege that the Self-Tender was a self-dealing transaction as part of an overall scheme to later sell the Company for three times the Self-Tender valuation.[90] The Company's Certificate of Incorporation contains an exculpatory provision, barring director liability for violations of the duty of care.[91] An exculpatory provision, however, "does not apply to [a defendant] in his capacity as [a] controlling stockholder."[92] For the reasons that follow, I find it reasonably conceivable that, through its 90% ownership stake, the Polk Family—including the Polk Family Directors—acted as a controlling stockholder such that entire fairness applies to Self-Tender.

---

[88] *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 642 (Del. 2014) (internal quotation marks omitted).

[89] *Id.* (citation omitted).

[90] *See* Compl. ¶ 1; Pls' Answering Br. 2–3.

[91] *See* Polk Defs' Opening Br. Ex. A ("No director of the corporation shall be liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, to the full extent such liability may be eliminated under the Delaware General Corporation Law as in effect from time to time."); *In re Dole Food Co., Inc. Stockholder Litig.*, 2015 WL 5052214, at *38–39 (Del. Ch. Aug. 27, 2015).

[92] *In re Dole Food Co.,* 2015 WL 5052214, at *39 (citation omitted).

15

Three Company directors were members of the Polk Family. The Complaint does not contain any allegations breaking down the distribution of stock ownership within the Polk Family. In addition, common familial relationships among holders of a majority of corporate voting power are not *per se* sufficient to establish a controlling group of stockholders.[93] Here, however, the record contains references to "the Polk Family" as a block, sufficient to make the Polk Family's status as a control block reasonably conceivable. The Offer to Purchase discloses that the "Polk Family" "owns or controls 485,377 shares representing 90.5% of the total number of shares outstanding as of March 31, 2011"[94] and regularly refers to the Polk Family and members of the Polk Family as though such was an entity or block.[95] Most significant, to me, is the allegation that Stephen Polk—Polk Chairman, CEO, President, and great-grandson of the Company's founder—referred to the Polk Family as a controlling block when he told the Board "the *Polk Family* was no longer interested in pursuing a short-form merger as a way to restructure the Company."[96] The Plaintiffs allege that the Polk Family held an interest in maintaining their

---

[93] *See In re PNB Holding Co. S'holders Litig.*, 2006 WL 2403999, at *10 (Del. Ch. Aug. 18, 2006) ("The record, though, does not support the proposition that these various director-stockholders and their family members were involved in a blood pact to act together. . . . Glomming share-owning directors together into one undifferentiated mass with a single hypothetical brain would result in an unprincipled Frankensteinian version of the already debatable 800-pound gorilla theory of the controlling stockholder.").

[94] Offer to Purchase at 18.

[95] *See, e.g.*, *id.* at 2, 5, 6, 10, 11, 18.

[96] Compl. ¶ 59 (emphasis added).

approximate 90% ownership of the Company in connection with the Self-Tender,[97] a detail meaningless unless that ownership was wielded as a block. In light of these specific facts, and under the minimal pleading requirements of Rule 12(b)(6), I find it reasonably conceivable that the Polk Family, together with the Polk Family Directors, acted as a controlling block comprising over 90% of Company stock. Other inferences could be drawn, but I find that the Plaintiffs have met their minimal burden here. I note, however, that given the Complaint's failure to break down the ownership structure of the "Polk Family," it is far from clear that all stockholders who are also relatives of the founder are members of a control block; nothing in this Memorandum Opinion should be read to the contrary. With that caveat, I refer to the Polk Family Class, together with the Polk Family Directors, as the "Control Group." It is reasonably conceivable that the Control Group controlled the Company and engineered—and stood on both sides of—the Self-Tender. Accordingly, the entire fairness standard applies at the pleading stage to the Self-Tender. As a result, the Control Group, and any directors for whom the Plaintiff has successfully pled non-exculpated claims, discussed in more detail below, has the burden of proving the Self-Tender was entirely fair.

The Complaint then points to the Control Group setting a price for the Self-Tender through the offices of a financial advisor, SRR, which also worked for

___

[97] *See id.* at ¶¶ 29, 34–36, 44.

members of the Polk Family individually. It alleges that those who tendered forwent, as a result, extraordinary dividends amounting to over one-third of the sale price they received, together with merger consideration in an amount *three times* the Self-Tender price, within a period of around two years. These facts adequately allege, at the pleading stage, that the transaction was not entirely fair to the Plaintiffs.

These unusual facts involve a tender to stockholders. They were not compelled to sell their stock to Polk. Entire fairness must therefore require examination of the disclosures to stockholders in light of the knowledge held by the Control Group at the time of the Self-Tender. Because the burden here is on the Control Group, I need not examine the disclosure allegations at this motion to dismiss stage with respect to these Defendants. The particular disclosure allegations, however, are pertinent to discussion of the Motion to Dismiss with respect to the remaining Defendants, as addressed below.

### B. The Non-Polk Family Directors

According to the Plaintiffs, the NP Directors "knowing and intentionally disregarded their fiduciary duties in bad faith to further the Polk family's fraudulent scheme."[98] More specifically, Plaintiffs' fundamental allegations against the NP Directors concern them acting as a "rubber stamp" for Stephen Polk in deciding to pursue the Self-Tender, while knowing of the alleged scheme to later sell the

---

[98] Pls' Answering Br. 23.

Company for a "blowout premium" and of alleged omissions in the Offer to Purchase related to that scheme.[99] In the presence of an exculpatory provision, plaintiffs must plead non-exculpated claims—that is, a breach of the duty of loyalty—against each defendant to avoid dismissal of that defendant in an action for damages even if entire fairness applies to the underlying transaction.[100] Also of importance here, "the mere fact that a director serves on the board of a corporation with a controlling stockholder does not automatically make that director not independent."[101] The Complaint does not attempt to show that the NP Directors were otherwise interested in the Self-Tender, or not independent. Therefore, the NP Directors must be dismissed in the absence of an adequate pleading of specific facts that imply bad faith.

The Plaintiffs attempt to show bad faith by alleging that each NP Director breached a duty of loyalty by failing to act in good faith in omitting alleged material disclosures. "A showing of bad faith requires an 'extreme set of facts to establish

---

[99] *See id.* at 2–3, 23–25; Compl. ¶¶ 78–80.

[100] *In re Cornerstone Therapeutics Inc, Stockholder Litig.*, 115 A.3d 1173, 1175–76 (Del. 2015) (holding that plaintiffs must plead non-exculpated claims against directors protected by exculpatory provisions *regardless of the standard of review*); *see also In re Dole Food Co.*, 2015 WL 5052214, at *39 ("In light of the Exculpatory Clause, [t]he liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director.") (internal quotation marks omitted).

[101] *In re Cornerstone Therapeutics*, 115 A.3d at 1183. *See also id.* at 1184 (explaining that "it does not follow that it is prudent to create an invariable rule that any independent director who says yes to an interested transaction subject to entire fairness review must remain as a defendant until the end of the litigation, regardless of the absence of any evidence suggesting that the director acted for an improper motive").

that disinterested directors were intentionally disregarding their duties or that the decision . . . [was] so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.'"[102]

The Plaintiffs plead eleven allegations that, in their view, establish bad faith by the NP Directors.[103] While the standard on a motion to dismiss is lenient, the Court will not "accept conclusory allegations unsupported by specific facts."[104] The Plaintiffs' allegations against the NP Directors lack such sufficient factual support. Effectively, the allegations here are that the NP Directors approved the Self-Tender, failed to adequately disclose the facts leading up to the Self-Tender, including facts

---

[102] *Nguyen v. Barrett*, 2016 WL 5404095, at *3 (Del. Ch. Sept. 28, 2016) (quoting *In re Chelsea Therapeutics Int'l Ltd. Stockholders Litig.*, 2016 WL 3044721, at *7 (Del. Ch. May 20, 2016)).

[103] The Plaintiffs allege that "[d]efendants Cole, Inatome, McClure, and Moore: (i) were present and participated in five specific board meetings in which the conduct alleged in the Complaint took place (¶ 78); (ii) did not hold any meeting or perform any investigation into converting the Company to Sub Chapter S Status as members of the Sub Chapter S committee (or for that matter to protect the minority in connection with the planned freeze-out that immediately preceded the Self-Tender) (¶¶ 78, 81); (iii) knew that Stephen Polk was planning to effectuate a short-form freeze out merger (¶¶ 81-83); (iv) knew that Stephen Polk used SRR and Honigman in connection with the planned short-form merger (*id.*); (v) solely at the direction of Stephen Polk abruptly switched from the short-form merger to a proposed self-tender and specifically approved of such action (¶¶ 82-84); (vi) knew that SRR simply recycled the work product done for Holding Company in furtherance of a short-form merger into a hastily done "fairness opinion" (¶ 84) and specifically authorized that action; (vii) approved the Self-Tender (¶¶ 83-84); (viii) knew of and specifically approved the Company paying the debt of Holding Company to SRR in connection with the work performed for Holding Company (¶ 84); (ix) knew of and specifically approved the disclosures that did not disclose any of the foregoing information (¶¶ 83-85); (x) knew of and specifically approved the disclosures that falsely stated that neither the Polk family or the Company was considering or had expressed any interest in a merger, sale of the Company (¶ 85); (xi) approved the dissemination of these disclosures knowing that they lacked material information that should have been disclosed to shareholders (*id.*)." Pls' Answering Br. 24–25 (citing paragraphs in the Complaint).

[104] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011).

regarding the contemplated freeze-out merger, the fact that the freeze-out was nixed by Stephen Polk on behalf of the Polk Family, and facts concerning SRR's involvement in consideration of the freeze-out. I need not address each allegedly faulty disclosure here, because for each, to constitute bad faith, I must rely on the inference that the NP Directors knew of a scheme to make the Self-Tender *in light of a plot to later sell the Company for a "blowout premium."* The Complaint fails to adequately allege bad faith in these mal-disclosures absent non-conclusory allegations that the NP Directors had this knowledge; such allegations are not in the Complaint, and nothing in the Complaint implies knowledge on the part of the NP Directors of such a scheme. Without such knowledge, nothing in the activity of the NP Directors, as alleged, clears the high bar of bad faith. Absent credible allegations that the independent directors were facilitating a fraud, for there to be a finding of bad faith solely from the omission of alleged material disclosures, such disclosures must be so facially necessary that it would be "beyond the bounds of reasonable judgment" and "inexplicable on any ground other than bad faith" to omit their disclosure.[105] I do not find the alleged omissions here to be of that class. At most (again, absent knowledge of the alleged fraudulent scheme) they represent an

---

[105] *Nguyen*, 2016 WL 5404095, at *3 (quoting *In re Chelsea Therapeutics*, 2016 WL 3044721, at *7).

21

inadequate disclosure of the background of the Self-Tender, a type of omission that does not implicate bad faith.

The Plaintiffs, as described above, fail to plead facts supporting a rational inference that the NP Directors "harbored self-interest adverse" to the minority Polk stockholders or "acted to advance the self-interest" of the Polk Family.[106] The Plaintiffs have also failed to plead specific facts that, if true, implicate bad faith on the part of the NP Directors. Accordingly, in light of my reasoning above, I find that the claims against the NP Directors must be dismissed.

*C. SRR and Honigman are Not Liable for Aiding and Abetting*

The Plaintiffs allege that SRR and Honigman aided and abetted the Individual Defendants in breaching their fiduciary duties.[107] To reiterate, Honigman was the legal advisor, and SRR the financial advisor, to Polk with respect to the Self-Tender. I have found that the Complaint adequately alleges that the Polk Family and Polk Family Directors—the Control Group—acted as a control block and that, as self-dealing fiduciaries, they must demonstrate that the Self-Tender transaction was entirely fair. I have also found that the Complaint fails to adequately plead a breach of the duty of loyalty on the part of the independent NP Directors. In light of these

---

[106] *In re Cornerstone Therapeutics Inc*, 115 A.3d at 1179–80. I also note that the Complaint does not contain any facts showing close personal or business relationships between the NP Directors and Stephen Polk or other members of the Polk Family. *See, e.g.*, *Sandys v. Pincus*, 152 A.3d 124 (Del. 2016).
[107] Compl. ¶¶ 137, 140.

findings, it is unclear what remains of the Plaintiffs' claims of aiding and abetting breaches of fiduciary duty, against the Company's legal and financial advisors. To the extent that such claims remain, they must be dismissed.

To state a claim for aiding and abetting a breach of fiduciary duty, plaintiffs must allege facts demonstrating a fiduciary relationship, a breach of the fiduciary's duty, knowing participation in that breach by the defendants, and damages proximately caused by the breach.[108] The standard for aiding and abetting is a "stringent one, one that turns on *proof of scienter* of the alleged abettor."[109] That is, a claim for aiding and abetting often turns on meeting the "knowing participation" element. Therefore, "there must be factual allegations in the complaint from which knowing participation can be reasonably inferred."[110] "Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach."[111] Additionally, "the element of knowing participation requires that the secondary actor have provided

---

[108] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

[109] *Binks v. DSL.net, Inc.*, 2010 WL 1713629, at *10 (Del. Ch. Apr. 29, 2010) (emphasis added).

[110] *In re Shoe-Town, Inc. Stockholders Litig.*, 1990 WL 13475, at *8 (Del. Ch. Feb. 12, 1990); *see also In re Gen. Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at *24 (Del. Ch. May 4, 2005) (explaining that "[i]f such facts are not pled, then in order to infer knowing participation, the plaintiff must have alleged that the fiduciary breached its duty in an inherently wrongful manner") (citations omitted) (internal quotation marks omitted).

[111] *Malpiede*, 780 A.2d at 1097 (Del. 2001); *see also In re Telecommunications, Inc.*, 2003 WL 21543427, at *2 (Del. Ch. July 7, 2003) ("[K]nowing participation may be inferred where the terms of the transaction are so egregious or the magnitude of side deals is so excessive as to be inherently wrongful.").

*substantial assistance* to the primary violator."[112]  Because I do not find it reasonably conceivable that SRR or Honigman knowingly provided substantial assistance to any fiduciaries' breach of duty, they must be dismissed.

### 1. Honigman

The Plaintiffs allege that the Company's legal advisor in connection with the Self-Tender, Honigman, "is believed to have substantially assisted in preparation of the disclosures for the Self-Tender and was aware of the misrepresentation and omission set forth herein."[113]  As an initial matter, I note that the Complaint does not allege that Honigman prepared the disclosures made to the stockholders.  Rather, the Complaint simply alleges that the Plaintiffs *believe* Honigman participated in preparing the disclosures.  At any rate, I find that the Plaintiffs have not met their burden of pleading knowing participation by Honigman in the Individual Defendants' alleged breaches of their fiduciary duties.

I start this analysis by pointing out the obvious; that almost all corporate boards retain law firms to advise them on significant transactions, and that those lawyers are limited by professional responsibilities in their freedom of action concerning information communicated by clients.  If pleading a plausible breach of duty on the part of a director or controller is also sufficient to implicate her lawyer

---

[112] *In re Dole Food Co.*, 2015 WL 5052214, at *41 (emphasis added) (internal quotation marks omitted).
[113] Compl. ¶ 75.

24

as an aider and abettor, a significant and perverse chilling effect on the ability of fiduciaries to obtain legal counsel would result. I need not speculate on what scenario could result in such a claim surviving a motion to dismiss, because I find it manifest that it is not the set of facts pled here.

According to the Plaintiffs, the following facts are sufficient to establish Honigman's knowing participation: Honigman's (1) forming Holding Co., (2) work for Polk, the Polk Family, Stephen Polk, and Holding Co. on exploring the short-form merger, (3) preparation of a legal memorandum for the sale of Polk, (4) advice to SRR to "revise its engagement letter with the Company to include the balance owed to" Holding Co., (5) maintaining Holding Co.'s active status in Delaware, (6) drafting of disclosures for the Self-Tender, and (7) formation of Merger Co.[114] These general allegations, to my mind, fall well short of a viable claim of aiding and abetting. At Oral Argument, the Plaintiffs clarified their claim; they stipulated that Honigman's advice to SRR to revise its engagement letter with Polk, which the Plaintiffs characterize as hiding Holding Co.'s bill, is the fact upon which Plaintiffs' claim for aiding and abetting hinges.[115] In other words, according to the Plaintiffs, the financial advisor's bill for work on the potential freeze-out merger was originally to be paid by Holding Co., the shell formed to facilitate the freeze-out. Once the

---

[114] Pls' Answering Br. 55–56.
[115] Oral Arg. Tr. 92:7–93:4 (May 31, 2017).

25

freeze-out was abandoned, Honigman recommended that this payment be allocated to the Company. According to the Plaintiffs, this was done for the purpose of hiding, from stockholders considering a tender, the fact that SRR had participated in the aborted freeze-out before opining on the fairness of the Self-Tender, thus facilitating inadequate disclosures on SRR's role to the stockholders. This fact, according to the Plaintiffs, also distinguishes Honigman's actions from any other law firm's simple participation in drafting a client's disclosures or advising on a transaction.[116] However, I find this strained interpretation far too thin a reed to support scienter and knowing participation in a breach of duty. As with the allegations against the NP Directors, this accounting change recommended by Honigman only appears nefarious if Honigman was privy to a scheme to, shortly after the Self-Tender, orchestrate a sale at a far higher price. The Plaintiffs have failed to allege facts sufficient to infer such knowledge on Honigman's part. I therefore do not find it reasonably conceivable that Honigman aided and abetted the alleged breaches of fiduciary duties by any Defendant.

### 2. SRR

The Plaintiffs allege that SRR aided and abetted the Defendants' breaches of their fiduciary duties because SRR "reviewed the disclosures in connection with the Self-Tender and was aware of the omissions and misrepresentations regarding its

---

[116] *Id.*

26

work."[117]     Specifically, according to the Plaintiffs, the facts supporting SRR's

knowing participation in the Individual Defendants' breaches of their fiduciary

duties are as follows:

> (i) SRR performed a valuation analysis of the Company on behalf of
> the controlling shareholder in a self-interested freeze-out merger and
> subsequently recycled that valuation and used it to provide a 'fairness
> opinion' purported for the benefit of the minority shareholders . . . (ii)
> the breach of fiduciary duty could not have been completed without
> SRR's valuation analysis, and SRR does not claim otherwise; (iii) SRR
> concealed the balance owed to it for the valuation work performed for
> Holding Company by rolling that balance into a bill to the Company;
> and (iv) SRR reviewed disclosures and was aware of the omissions and
> representations regarding its work and that the disclosures failed to
> reference the Polk family's plan to freeze out the minority shareholders
> and yet consented to the use of its name and the description of its
> work.[118]

The Plaintiffs allege that the Offer to Purchase omitted the facts that "SRR was

engaged as the financial advisor by the Holding Company/Polk Family Class in

connection with the contemplated short-form merger"[119] and "SRR simply recycled

the work it performed on behalf of the Holding Company to rush through a fairness

opinion for the supposed benefit of the minority shareholders."[120]

Disclosure of the fact that SRR had worked on a valuation of the Company

prior to rendering its fairness opinion on the Self-Tender is, frankly, not clearly

---

[117] Compl. ¶ 75.
[118] Pls' Answering Br. 52 (citing Compl. ¶ 75).
[119] Compl. ¶ 4(ii).
[120] *Id.* at ¶ 4(iii).

material to stockholders considering a tender; however, even if I assume its materiality, the aiding and abetting claim against SRR must be dismissed. Even if these omissions were material and assuming SRR's knowledge of them, the Complaint lacks sufficient facts from which I may infer that SRR's alleged failure to attempt to correct these omissions results in "knowing participation" in the alleged breach of the Individual Defendants' fiduciary duties. The Directors were aware of all the facts that the Complaint presumes SRR knew. A general duty on *third parties* to ensure that all material facts are disclosed, by fiduciaries to their principals, is, so far as I am aware, not a duty imposed by law or equity. There is, obviously, no allegation here that SRR worked a fraud on the directors, or otherwise caused misrepresentations in connection with the Self-Tender by withholding information from fiduciaries.[121] The Plaintiffs allege only a passive awareness on the part of a non-fiduciary of the omission of material facts in disclosures to the stockholders, made by fiduciaries *who themselves were aware of the information*. Such passive awareness on the part of SRR does not constitute "substantial assistance" to any breach resulting from the Individual Defendants' failure to disclose the facts.

---

[121] *See, e.g.*, *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 865 (Del. 2015) (explaining that the claim for aiding and abetting there was based on the financial advisors' "fraud on the Board" and noting that the financial advisor "intentionally duped" the directors into breaching their duty of care) (citation omitted).

Once again, the Plaintiffs' primary argument regarding aiding and abetting by SRR involves its payment for work done on the ill-fated freeze-out merger. The Plaintiffs allege that SRR assisted Holding Co. with a contemplated but never-consummated short-form merger with the Company,[122] and then the Company rolled that bill into its overall bill for the 2011 Self-Tender.[123] At the motion to dismiss stage, I accept these allegations as true, and assume, for purposes of this motion only, that disclosure of these facts was material to stockholders contemplating whether to tender. As stated above, any disclosure obligation arising from these facts falls on the fiduciaries. Passive failure on the part of third parties to ensure adequate disclosure to stockholders, without more, cannot support an inference of scienter or knowing *participation* in a breach. Therefore, for the reasons explained above, I do not find it reasonably conceivable that SRR aided and abetted the Individual Defendants' alleged breaches of fiduciary duties.

### III. CONCLUSION

For the foregoing reasons, the Motions to Dismiss are granted as to the NP Directors, SRR, and Honigman, and otherwise denied. The parties should provide an appropriate form of order consistent with this Memorandum Opinion.

---

[122] *Id.* at ¶ 13.
[123] *Id.* at ¶ 60.