# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| IN RE KRAFT HEINZ COMPANY DERIVATIVE LITIGATION | ) <br> ) CONSOLIDATED <br> ) C.A. No. 2019-0587-LWW <br> ) |

## MEMORANDUM OPINION

Date Submitted: October 4, 2021
Date Decided: December 15, 2021

Joel Friedlander, Jeffrey Gorris, and Christopher M. Foulds, FRIEDLANDER & GORRIS P.A., Wilmington, Delaware; P. Bradford deLeeuw, DELEEUW LAW LLC, Wilmington, Delaware; David A. Jenkins and Robert K. Beste III, SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; Eduard Korsinsky, Gregory M. Nespole, Nicholas I. Porritt, and Daniel Tepper, LEVI & KORSINSKY LLP, New York, New York; Jeffrey S. Abraham, Mitchell M. Z. Twersky, Atara Hirsch, and Michael J. Klein, ABRAHAM, FRUCHTER & TWERSKY, LLP, New York, New York; Lawrence P. Eagel, W. Scott Holleman, Melissa A. Fortunato, and Marion C. Passmore, BRAGAR EAGEL & SQUIRE, P.C., New York, New York; Michael VanOverbeke, VANOVERBEKE, MICHAUD & TIMMONY, P.C., Detroit, Michigan; Deborah Sturman, STURMAN LLC, New York, New York; *Counsel for Plaintiffs General Retirement System of the City of Detroit, Police & Fire Retirement System of the City of Detroit, and Erste Asset Management GmbH*

Michael A. Pittenger, Jacqueline A. Rogers, and Caneel Radinson-Blasucci, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Sandra C. Goldstein, Stefan Atkinson, and Kevin M. Neylan, Jr., KIRKLAND & ELLIS LLP, New York, New York; *Counsel for Defendants 3G Capital, Inc., 3G Capital Partners Ltd., 3G Capital Partners II LP, 3G Global Food Holdings GP LP, 3G Global Food Holdings LP, and HK3 18 LP*

Matthew D. Stachel, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; Daniel J. Kramer, Andrew J. Ehrlich, and William A. Clareman, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York; *Counsel for Defendants Bernardo Hees, Alexandre Behring, Jorge*

*Paulo Lemann, Marcel Herrmann Telles, Paulo Basilio, David Knopf, and Eduardo Pelleissone, and Nominal Defendant The Kraft Heinz Company*

**WILL, Vice Chancellor**

This stockholder derivative action arises from 3G Capital, Inc's sale of 7% of its then-24% stake in The Kraft Heinz Company. The sale was followed by Kraft Heinz disclosing disappointing financial results and its stock price dropping significantly. 3G's proceeds from the sale exceeded $1.2 billion.

In this litigation, the plaintiffs contend that defendants 3G, entities affiliated with it, and certain dual fiduciaries of 3G and Kraft Heinz breached their fiduciary duties to Kraft Heinz stockholders. The plaintiffs' claims are based on allegations that the defendants either approved 3G's stock sale based on adverse material nonpublic information or allowed 3G to effectuate the sale to the detriment of Kraft Heinz and its non-3G stockholders.

As with every stockholder derivative action, the plaintiffs must adhere to Court of Chancery Rule 23.1 by making a demand on the board of directors or demonstrating that a demand would have been futile. The plaintiffs did not make a demand on the Kraft Heinz board and maintain that demand should be excused because a majority of the board is not independent of 3G. For the reasons explained below, the plaintiffs have failed to establish demand futility. As such, the action is dismissed in its entirety.

## I.    BACKGROUND

The following facts are drawn from the Consolidated Amended Verified Stockholder Derivative Complaint (the "Complaint") and the documents it incorporates by reference.[1]

### A.    The Kraft Heinz Company Is Formed.

The Kraft Heinz Company is a publicly traded Delaware corporation that describes itself as "one of the largest global food and beverage companies."[2]  Kraft Heinz was formed in 2015 when Kraft Food Groups, Inc. ("Kraft") merged with The H.J. Heinz Company ("Heinz").

Heinz was jointly purchased by global investment firm 3G Capital, Inc.[3] and Berkshire Hathaway Inc. in 2013.[4]  3G and Berkshire each took a 50% stake in the

---

[1] Consolidated Am. Verified Stockholder Derivative Compl. ("Compl.") (Dkt. 117). *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) ("[A] plaintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms."); *Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint . . . .").  The parties agreed that documents produced by Kraft Heinz pursuant to 8 *Del. C.* § 220 would be deemed incorporated into any complaint the plaintiffs filed. *See Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016).

[2] Compl. ¶ 53.

[3] For the reader's benefit, the court will, at times, refer to the defendant 3G-affiliated entities (3G Capital, Inc., 3G Capital Partners Ltd., 3G Capital Partners II LP, 3G Global Food Holdings GP LP, 3G Global Food Holdings LP, and HK3 18 LP) together as "3G."

[4] Compl. ¶ 3.

company and contributed $4 billion in capital as part of the deal.[5]  3G was charged with managing the day-to-day operations of Heinz.  3G partners (and defendants) Bernando Hees and Paulo Basilio were named CEO and CFO, respectively.[6]

3G—founded by defendants Jorge Paulo Lemann, Alexandre Behring, and Marcel Herrmann Telles, among others—had previously and successfully rolled up brand-name companies in the food and beverage and hospitality sectors.[7]  For example, 3G was involved in the creation of Anheuser-Busch InBev ("AB InBev"), in which Berkshire once held a large stake.[8]  Berkshire also invested alongside 3G in Burger King's 2014 acquisition of Canadian fast food chain Tim Hortons.[9]

On March 24, 2015, Heinz entered into an Agreement and Plan of Merger with Kraft to form Kraft Heinz.[10]  Kraft stockholders approved the merger agreement on July 1, 2015 and the merger closed the next day.[11]  Post-closing, 3G and Berkshire together owned roughly 51% of Kraft Heinz, with 3G holding 24.2% and Berkshire

---

[5] *Id.* ¶ 64.

[6] *Id.*

[7] *Id.* ¶ 25.

[8] *Id.* ¶¶ 26(a), 47.

[9] *Id.* ¶ 47.

[10] *Id.* ¶ 69.

[11] *Id.* ¶ 73.

holding 26.8%.[12] Legacy Kraft stockholders owned the remaining 49% of the company.[13]

Under the Merger Agreement, Kraft Heinz's eleven-member board of directors (the "Board") was composed of five former Kraft directors, three 3G designees, and three Berkshire designees.[14] 3G appointed Behring, Lemann, and Telles to the Board.[15] Berkshire appointed Gregory Abel, Warren Buffett, and Tracy Britt Cool.[16] John T. Cahill, the former CEO and chairman of Kraft, was among the five former Kraft directors who completed the original Board.[17] 3G's Hees and Basilio became the CEO and CFO of Kraft Heinz.[18] Basilio was later replaced by another 3G partner, defendant David Knopf.[19]

The day the merger closed, 3G and Berkshire entered into a Shareholders' Agreement.[20] The Shareholders' Agreement required Berkshire and 3G to vote their

---

[12] *Id.* ¶ 79.

[13] *Id.*

[14] *Id.* ¶ 72.

[15] *Id.* ¶ 73.

[16] *Id.*

[17] *Id.*

[18] *Id.* ¶¶ 2, 75.

[19] *Id.* ¶ 75.

[20] *Id.* ¶ 76.

4

shares in favor of each other's Board nominees.[21]  3G and Berkshire also agreed not to take any action "to effect, encourage, or facilitate" the removal of the other's director designees.[22]  Kraft Heinz's March 3, 2016 proxy statement explained that "Berkshire Hathaway, Mr. Buffett and the 3G Funds may be deemed to be a group for purposes of Section 13(d) of the Exchange Act."[23]

### B.    3G Sells $1.2 Billion of Kraft Heinz Stock.

On August 2, 2018, Hees, Knopf, and Kraft Heinz's then-Executive Vice President (and defendant) Eduardo Pelleissone informed the Board that Kraft Heinz was unlikely to achieve its EBITDA target for the first half of 2018 and was expected to miss its 2018 full year target by over $700 million.[24]  The news came after Kraft Heinz had already missed its 2017 EBITDA target of $8.5 billion by $440 million, missed its target for the first quarter of 2018, and reduced its 2018 full year EBITDA projections from $8.4 billion to $8 billion.[25]  Behring, Lemann, Telles, and Basilio

---

[21] Stachel Decl. Ex. 14 at F-3 (Dkt. 127); Compl. ¶¶ 48, 76-78.  The number of designees that 3G or Berkshire had to actively support per the Shareholders' Agreement fell at a predetermined rate alongside their voting power relative to the signing date.  *See* Stachel Decl. Ex. 14 at F-3.

[22] Stachel Decl. Ex. 14 at F-3; Compl. ¶ 48.

[23] Compl. ¶ 79.

[24] *Id.* ¶¶ 10, 40, 152

[25] *Id.* ¶¶ 93, 111, 118.  The Complaint alleges that 2017 EBITDA projections were missed by $530 million.  Kraft Heinz Board slides show a miss of $440 million.  *See* Rogers Decl. Ex. 9 at 7 (Dkt. 124).

(in addition to Hees and Knopf) were present at the meeting.[26] The Audit Committee and Knopf had previously been informed that Kraft Heinz's goodwill and intangible asset valuations were largely driven by Kraft Heinz management's revenue and cash flow forecasts.[27]

Four days after the Board meeting, on August 7, 2018, 3G sold 7% of its stake in Kraft Heinz for proceeds of over $1.2 billion.[28] The trade was made possible by Kraft Heinz removing the shares' restrictive legends.[29] Before their removal, a 3G partner had provided Kraft Heinz's counsel with a statement that 3G "is not in possession of any material, non-public information."[30] Pelleissone personally sold about $2.3 million of his Kraft Heinz shares on the same day.[31]

### C. Kraft Heinz Announces Poor Financial Results and an Accounting Impairment.

A pair of financial announcements followed by significant one-day price drops came next. On November 1, 2018, Kraft Heinz reported its third quarter 2018 financial results—it had missed its EBITDA target for the quarter by $232 million.[32]

---

[26] Compl. ¶ 152.

[27] *Id.* ¶ 107.

[28] *Id.* ¶ 169.

[29] *Id.* ¶¶ 168, 171.

[30] *Id.* ¶ 171.

[31] *Id.* ¶ 40.

[32] *Id.* ¶¶ 186, 193.

Kraft Heinz's stock price fell nearly 10% from close on November 1 to close on November 2, 2018.[33] On February 21, 2019, Kraft Heinz reported its fourth quarter and full year 2018 financial results, again missing internal targets by hundreds of millions of dollars.[34] It also disclosed an adjustment to its goodwill and intangible assets resulting in a non-cash impairment charge of $15.4 billion.[35] Kraft Heinz's stock price fell roughly 27.5% from close on February 21 to close on February 22, 2019.[36]

Litigation followed. On February 24, 2019, a federal securities class action was filed in the United States District Court for the Northern District of Illinois (the "Federal Securities Action") against Kraft Heinz, various 3G entities, Hees, Basilio, Knopf, Behring, and certain non-parties to this action including Board member George Zoghbi, a former Kraft Heinz executive.[37] A consolidated class action complaint was filed in that action on January 6, 2020.[38]

---

[33] *Id.* ¶ 195.

[34] *Id.* ¶¶ 202, 204.

[35] *Id.* ¶¶ 204-05.

[36] *Id.* ¶ 208.

[37] *See id.* ¶¶ 34, 44, 242-44.

[38] *Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at *1-2 (N.D. Ill. Aug. 11, 2021).

### D.    This Litigation

Kraft Heinz stockholders began filing derivative complaints related to 3G's sale in this court on July 30, 2019.[39]  Those actions were consolidated on January 22, 2020.[40] On March 13, 2020, the court designated the General Retirement System of the City of Detroit, the Police & Fire Retirement System of the City of Detroit, and Erste Asset Management GmbH as co-lead plaintiffs.[41]  On April 27, 2020, the plaintiffs filed the Complaint, which relied upon documents obtained pursuant to 8 *Del. C.* § 220.[42]

The Complaint advances three counts on behalf of Kraft Heinz.  Count I alleges breaches of fiduciary duty under *Brophy v. Cities Service Company*[43] for either approving 3G's August 7, 2018 block sale of Kraft Heinz stock based on adverse material nonpublic information or allowing the sale to the detriment of Kraft Heinz's non-3G stockholders.[44]  Count II seeks contribution and indemnification from the defendants for allegedly causing Kraft Heinz to issue false and misleading statements in violation of federal securities laws.[45]  Count III brings aiding and

---

[39] *See* Dkt. 39 (listing the various derivative complaints filed against Kraft Heinz).

[40] *Id.*

[41] Dkt. 106.

[42] Dkt. 117.

[43] 70 A.2d 5 (Del. Ch. 1949).

[44] Compl. ¶¶ 237-40.

[45] *Id.* ¶¶ 241-53.

abetting claims against several 3G entity defendants that were "the mechanisms through which 3G accomplished" the sale.[46]

The defendants moved to dismiss the Complaint on June 12, 2020.[47] Following the denial of two motions to dismiss in the Federal Securities Action,[48] the parties were given an opportunity to submit supplemental briefing on any effect the Federal Securities Action decision might have on the issues presented here.[49]

## II.    LEGAL ANALYSIS

The defendants have moved to dismiss the Complaint under Court of Chancery Rule 23.1 for failure to make a demand on the Kraft Heinz Board and under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief. In the alternative, the individual defendants have moved to stay this action pending the resolution of the Federal Securities Action.[50]

As with all derivative cases, demand excusal is a threshold issue. My analysis begins and ends there. After conducting a demand futility analysis on a director-by-

---

[46] *Id.* ¶¶ 254-57; *see supra* note 3 (listing those 3G entities).

[47] Dkts. 124, 125. Chancellor Bouchard heard argument on the motions to dismiss on November 5, 2020. *See* Dkt. 146. After this matter was reassigned to me, I heard reargument on June 29, 2021. *See* Dkt. 155.

[48] *See Hedick*, 2021 WL 3566602, at *1.

[49] Dkt. 157. The parties also submitted unsolicited letters addressing the Delaware Supreme Court's decision in *United Food & Commercial Workers Union v. Zuckerberg*. *See* Dkts. 169, 170; *infra* notes 60-63 and accompanying text.

[50] Dkts. 124, 125.

9

director basis, I conclude that a majority of the Board was disinterested and independent. Demand is therefore not excused, and the plaintiffs lack standing to press this derivative action.

## A. The Demand Futility Standard

Under Court of Chancery Rule 23.1, a stockholder who seeks to displace the board's authority by asserting a derivative claim on behalf of a corporation must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[51] This requirement is rooted in the "basic principle of the Delaware General Corporation Law . . . that the directors, and not the stockholders, manage the business and affairs of the corporation."[52] "It is designed to give a corporation, on whose behalf a derivative suit is brought, the opportunity to rectify the alleged wrong without suit and to control any litigation brought for its benefit."[53]

Stockholders who forego a demand must "comply with stringent requirements of factual particularity" when alleging why demand should be excused.[54] "Rule 23.1

---

[51] Ct. Ch. R. 23.1.

[52] *FLI Deep Marine LLC v. McKim*, 2009 WL 1204363, at *2 (Del. Ch. Apr. 21, 2009).

[53] *Lewis v. Aronson*, 466 A.2d 375, 380 (Del. Ch. 1983), *rev'd on other grounds*, 473 A.2d 805 (Del. 1984).

[54] *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000).

10

is not satisfied by conclusory statements or mere notice pleading."[55] Instead, "[w]hat the pleader must set forth are particularized factual statements that are essential to the claim."[56]

The court is confined to the well-pleaded allegations in the Complaint, the documents incorporated into the Complaint by reference, and facts subject to judicial notice while conducting a Rule 23.1 analysis.[57] All reasonable inferences from the particularized allegations in the Complaint must be drawn in the plaintiffs' favor.[58] Under the heightened pleading requirement of Rule 23.1, "conclus[ory] allegations of fact or law not supported by the allegations of specific fact may not be taken as true."[59]

The Delaware Supreme Court recently established a three-part, "universal test" for assessing demand futility in *United Food & Commercial Workers Union v. Zuckerberg*.[60] The test is "consistent with and enhances" the standards articulated

---

[55] *Id.*

[56] *Id.*

[57] *See, e.g.*, *White v. Panic*, 783 A.2d 543, 546-47 (Del. 2001); *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169-70 (Del. 2006).

[58] *Brehm*, 746 A.2d at 255.

[59] *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988).

[60] 2021 WL 4344361, at *9 (Del. Sept. 23, 2021).

in *Aronson*, *Rales*, and their progeny, which "remain good law."[61]   Under

*Zuckerberg*, this court must consider, director-by-director:

> (i)    whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii)   whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
>
> (iii)  whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[62]

If "the answer to any of these three questions is 'yes' for at least half of the members

of [a] demand board," demand is excused as futile.[63]

## B.    The Demand Futility Analysis in This Case

"The court 'counts heads' of the members of a board to determine whether a

majority of its members are disinterested and independent for demand futility

purposes."[64]  The Board in place when this litigation was first filed on July 30, 2019

had eleven members: (1) defendant Lemann; (2) defendant Behring; (3) non-party

Joao M. Castro-Neves, a 3G partner; (4) non-party Abel, a Berkshire designee;

---

[61] *Id.* at *17.

[62] *Id.*

[63] *Id.*

[64] *See In re Zimmer Biomet Hldgs., Inc. Deriv. Litig.*, 2021 WL 3779155, at *10 (Del. Ch. Aug. 25, 2021).

(5) non-party Cool, a Berkshire designee;[65] (6) non-party Cahill, a former Kraft Heinz consultant and the former CEO of Kraft; (7) non-party Zoghbi, a former Kraft Heinz executive and current consultant; (8) non-party Alexandre Van Damme, a director of AB InBev; (9) non-party Feroz Dewan, who joined the Board in 2016; (10) non-party Jeanne P. Jackson, a former Kraft director; and (11) non-party John C. Pope, a former Kraft director.[66] This decision refers to those eleven directors as the "Demand Board."

The defendants concede that the three 3G-affiliated directors—Lemann, Behring, and Castro-Neves—could not exercise impartial judgment regarding a demand.[67] The plaintiffs, for their part, concede that Jackson and Pope are independent and disinterested for purposes of a demand futility analysis.[68]

---

[65] The parties disagree on whether Cool or non-party and Berkshire designee Timothy Kenesey was the eleventh member of the Demand Board. Cool is the relevant Board member because she was on the Board when the first complaint in this action was filed. *See Braddock v. Zimmerman*, 906 A.2d 776, 785-86 (Del. 2006). Regardless, the parties agree that the independence analysis as to Kenesey or Cool is largely the same. *See* Opening Br. in Supp. of Nom. Def.'s and Individual Defs.' Mot. to Dismiss 21 n.8 ("Individual Defs.' Opening Br.") (Dkt. 126); Pls.' Answering Br. 56 n.9 (Dkt. 134) ("Cool was replaced on the Board by longtime Berkshire executive Kenesey . . . so the demand futility analysis is not meaningfully changed by Cool's departure.").

[66] *See* Compl. ¶¶ 34-35, 42-47, 49, 51-52; Pls.' Answering Br. 48.

[67] *See* Individual Defs.' Opening Br. 18 ("[T]he Complaint's allegations do not demonstrate that 8 of Kraft Heinz's 11 directors . . . would lack independence in connection with a demand . . . .").

[68] The Complaint does not allege any facts challenging Jackson or Pope's independence, and the plaintiffs did not mention either director in their answering brief opposing the motion to dismiss. *See generally* Compl.; Pls.' Answering Br.

That leaves six directors for consideration: Dewan, Abel, Cool, Cahill, Zoghbi, and Van Damme. Only the third prong of the *Zuckerberg* test is relevant to that assessment. None of these directors are alleged to have sold Kraft Heinz stock during the relevant period or personally benefitted from 3G's sale. These non-party directors would not face a substantial likelihood of liability, even if were assumed that the court might find in the plaintiffs' favor after trial.[69] The demand futility analysis hinges entirely on whether the directors had disabling connections to 3G. If four of these six directors could exercise their independent and disinterested judgment regarding a demand to sue 3G, Rule 23.1 mandates dismissal.

1.     The Plaintiffs' Control Allegations

The plaintiffs contend that the "demand futility analysis is strengthened by 3G's status as a controlling stockholder."[70] "[T]he presence and influence of a controller is an important factor that should be considered in the director-based focus

---

[69] *See* Compl. ¶ 44. The plaintiffs argue that the federal court's denial of motions to dismiss in the Federal Securities Action "confirm[s] that [Zoghbi] faces a substantial threat of liability." Dkt. 163 at 11; *see Pfeiffer v. Toll*, 989 A.2d 683, 689-90 (Del. Ch. 2010) (finding demand futile where the director defendants were also named in a companion federal securities action that survived a motion to dismiss). But demand futility is measured at the time a complaint is filed. *See Rales v. Blasband*, 634 A.2d 927, 937 (Del. 1993) ("[T]he appropriate inquiry is whether [the complaint] raises a reasonable doubt regarding the ability of a majority of the Board to exercise its business judgment . . . at the time this action was filed."); *In re LendingClub Corp. Deriv. Litig.*, 2019 WL 5678578, at *15 (Del. Ch. Oct. 31, 2019) (explaining that the survival of a federal securities action against a motion to dismiss did not affect demand futility allegations in a complaint filed before that motion to dismiss was decided).

[70] Pls.' Answering Br. 48-49.

14

of the demand futility inquiry . . . particularly on the issue of independence."[71] As Chancellor Chandler explained in *Orman v. Cullman*, an independence inquiry focuses on whether a director's decision would "result[] from that director being *controlled* by another," meaning that the director was dominated by or beholden to "the allegedly controlling entity."[72]

3G is not Kraft Heinz's largest stockholder. At the filing of this litigation (post-sale), 3G owned approximately 22% of Kraft Heinz's stock.[73] 3G had the right to appoint three of the Board's 11 members under the Shareholders' Agreement.[74] Berkshire—which was disinterested in the stock sale—beneficially owned about

[71] *In re BGC P'rs, Inc.*, 2019 WL 4745121, at *8 (Del. Ch. Sept. 30, 2019) ("Put simply, 'Delaware is more suspicious when the fiduciary who is interested is a controlling stockholder.'" (citing Leo E. Strine, Jr., *The Delaware Way: How We Do Corporate Law and Some of the New Challenges We (and Europe) Face*, 30 Del. J. Corp. L. 673, 678 (2005))); *see also id.* at *7 ("Our law is not blind to the practical realities of serving as a director of a corporation with a controlling stockholder."); *In re Ezcorp Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *29 n.24 (Del. Ch. Jan. 25, 2016) (explaining that in the context of a controlling stockholder transaction, directors may "preserve their positions and align themselves with the controller by not doing something, *viz.* by not initiating litigation").

[72] 794 A.2d 5, 25 n.50 (Del. Ch. 2002).

[73] *See* Compl. ¶¶ 79, 170 (discussing a prior transfer of 2.8 million shares).

[74] *Id.* ¶ 72; *see Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006) ("The fact that an allegedly controlling shareholder appointed its affiliates to the board of directors is one of many factors Delaware courts have considered in analyzing whether a shareholder is controlling.").

27% of Kraft Heinz and could also designate three directors under the Shareholders' Agreement.[75]

The plaintiffs maintain that 3G and Berkshire should be viewed as a "control group" because they are bound together in a legally significant way based on the Shareholders' Agreement.[76] The defendants disagree.[77] Like the voting agreement in *Sheldon v. Pinto Technology Ventures*—which did not establish a control group— the Shareholders' Agreement "only govern[ed] the election of certain directors," did not require the stockholders "to vote 'together' on any transaction," and was not "implicated" in the transaction.[78]

Whether 3G should be deemed a controlling stockholder (on its own or together with Berkshire) does not, however, "change[] the director-based focus of the demand futility inquiry."[79] As the Delaware Supreme Court explained in *Aronson*, even "proof of majority ownership of a company does not strip the

---

[75] Compl. ¶¶ 72, 79.

[76] *Id.* ¶¶ 2, 48; Pls.' Answering Br. 40-44; *see Sheldon v. Pinto Tech. Ventures, L.P.*, 220 A.3d 245, 252 (Del. 2019).

[77] *See* 3G Defs.' Reply Br. 30-32 (Dkt. 139).

[78] 220 A.3d at 253-54.

[79] *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 67 (Del. Ch. 2015); *see also Lenois v. Lawal*, 2017 WL 5289611, at *13 & n.103 (Del. Ch. Nov. 7, 2017) (discussing *Baiera* and declining to find demand excused solely because an "interested transaction with a conflicted controller" was at issue).

directors of the presumption of independence" in the demand context.[80]  Instead, "[t]here must be coupled with the allegation of control such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person."[81]  Regardless of whether 3G controlled Kraft Heinz together with Berkshire, the plaintiffs cannot overcome the presumption of independence for a majority of the Demand Board.

### 2. The Demand Board's Independence from 3G

As discussed above, demand futility will be determined by whether at least four of Dewan, Abel, Cool, Cahill, Zoghbi, and Van Damme could have independently considered a demand to sue 3G.  At the motion to dismiss stage, "a lack of independence turns on 'whether the plaintiffs have pled facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party.'"[82]

---

[80] *Aronson*, 473 A.2d at 815.

[81] *Id.*; *see Baiera*, 119 A.3d at 68 (explaining that, in assessing demand futility where a controller is alleged to have engaged in self-dealing, the "focus" is "on whether [the p]laintiff's allegations raise a reasonable doubt as to the impartiality of a majority of the Demand Board to have considered such a demand"); *Beam v. Stewart*, 845 A.2d 1040, 1054 (Del. 2004) (rejecting the premise that majority control overcame the other directors' presumed independence in the demand futility context).

[82] *Sandys v. Pincus*, 152 A.3d 124, 128 (Del. 2016) (quoting *Del. Cty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1023 n.25 (Del. 2015)).

When assessing independence, "our law cannot ignore the social nature of humans or that they are motivated by things other than money, such as love, friendship, and collegiality."[83] The court must "consider all the particularized facts pled by the plaintiffs about the relationships between the director and the interested party in their totality and not in isolation from each other, and draw all reasonable inferences from the totality of those facts in favor of the plaintiffs."[84]

After doing so, I conclude that the plaintiffs have not pleaded particularized facts sufficient to create reasonable doubt about the independence of Dewan, Abel, Cool, and Cahill. Because they join the concededly independent and disinterested Jackson and Pope to form a majority of the Demand Board, demand is not excused under Rule 23.1.

### a. Dewan

Feroz Dewan has served on the Board since October 2016.[85] The plaintiffs assert that he is beholden to 3G but do not plead any particularized facts undermining his independence. The only grounds provided to question Dewan's independence are (1) that Dewan's private foundation held more than 12% of its investment

---

[83] *Marchand v. Barnhill*, 212 A.3d 805, 818 (Del. 2019) (internal quotation marks omitted).

[84] *Sanchez*, 124 A.3d at 1019; *Ezcorp*, 2016 WL 301245, at *34 ("Evaluating a board's ability to consider a demand impartially . . . requires a 'contextual inquiry.'" (quoting *Beam*, 845 A.2d at 1049)).

[85] Compl. ¶ 46.

18

portfolio in a 3G fund as of 2016, and (2) that Dewan chairs a non-profit that receives donations from organizations including 3G-controlled Restaurant Brands International ("RBI").[86] No further context is provided, including whether Dewan's foundation remained invested in a 3G fund when this litigation was filed, whether 3G had a role in RBI's donation, and whether RBI's donation was material to the charity.[87] Without that information, it is not possible to infer that Dewan lacks independence from 3G.[88]

### b. Abel and Cool

Gregory Abel previously served on the Heinz board and has served as a Berkshire designee on the Board since the merger.[89] He is a member of Berkshire's

---

[86] *Id.* The foundation Dewan chairs listed RBI alongside eleven other "donor foundations and organizations" on its website. *Id.* Additionally, the plaintiffs note that 3G "has a practice of inviting its investors to join the boards of companies it acquires" but do not indicate that 3G nominated Dewan to the Board. *Id.*

[87] *See In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 822-23 (finding allegations that a director serving as president and a trustee of a museum that received contributions from the interested party were insufficient to demonstrate a lack of independence because plaintiffs "never state[d] how" the contributions "could, or did, affect the decision-making process" of the director); *Beam*, 845 A.2d at 1050 ("[T]o render a director unable to consider demand, a relationship must be of a bias-producing nature."); *see also Zuckerberg*, 2021 WL 4344361, at *19 (following the lower court's reasoning that "[t]here is no logical reason to think that a shared interest in philanthropy would undercut [the director's] independence" (citation omitted)).

[88] The plaintiffs acknowledged Dewan's independence at oral argument on the motion to dismiss. *See* Mot. to Dismiss Hr'g Tr. Nov. 5, 2020, at 69 (Dkt. 146) (plaintiffs' counsel representing that because there are "only five people" that "the Court needs to pay attention to"—Abel, Cool, Van Damme, Cahill, and Zoghbi—"[t]he Court can ignore Dewan because it falls by the wayside").

[89] Compl. ¶ 47.

19

board of directors and its Vice Chairman of Non-Insurance Business Operations.[90] The plaintiffs allege that he "lacks independence given Berkshire's close co-investing relationship with 3G and Buffett's close friendship with Lemann."[91]

Tracy Britt Cool also served on the Heinz board and served as a Berkshire Board designee after the merger until January 2020.[92] Cool joined Berkshire in 2009 as a financial assistant to Buffett and has served as a director of several Berkshire companies and as the CEO of a Berkshire subsidiary.[93] She allegedly has a close relationship with Buffett, who "walked Cool down the aisle at her wedding in 2013."[94] The plaintiffs aver that she lacks independence "by virtue of her personal relationship with Buffett and her career as a longtime Berkshire executive."[95]

The parties' arguments with regard to the independence of Abel and Cool are substantively identical. Considered in their totality, the plaintiffs' allegations provide no reason to doubt that either director could not exercise disinterested and independent judgment regarding a demand.[96]

---

[90] *Id.*

[91] *Id.*

[92] *Id.* ¶ 49.

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] *See id.* ¶¶ 47, 49; Individual Defs.' Opening Br. 21; Pls.' Answering Br. 56 (arguing that Abel and Cool lack independence from 3G "because they owe their careers to Warren Buffett, who is close friends with Lemann"); Reply Br. in Supp. of Nominal Def.'s and the

Neither Abel nor Cool has any direct relationships with 3G or its defendant partners.  Rather, Abel and Cool are allegedly not independent of 3G because they are beholden to Berkshire and Buffett who, in turn, are beholden to 3G and its partners.  This transitive theory of independence does not impugn Abel or Cool's independence for several reasons.[97]

First, the plaintiffs assert that Abel and Cool's employment and potential for promotion at Berkshire "would be jeopardized by causing [Kraft Heinz] to sue 3G or Lemann."[98]  This argument ties back, in some respects, to the plaintiffs' allegation that Berkshire and 3G are a control group.[99]  Delaware courts have recognized that when a controller is interested in a transaction, directors may seek to "preserve their positions and align themselves with the controller" by declining to initiate litigation against it.[100]  That logic might apply if Abel and Cool were asked to consider

---

Individual Defs.' Mot. to Dismiss 4 (Dkt. 138); Mot. To Dismiss Hr'g Reargument Tr. June 29, 2021, at 132 (Dkt. 156) (plaintiffs' counsel noting that the distinctions between Abel and Cool are "probably a moot point . . . because the same analysis applies to both or either").

[97] *See In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 997-98 (Del. Ch. 2014) (analyzing similar "transitive" independence allegations), *aff'd*, 125 A.3d 304 (Del. 2015).

[98] Pls.' Answering Br. 56.  The plaintiffs' brief also asserts that "Buffett retains influence over how Berkshire director designees vote." *Id.* at 57.  This contention includes no citation back to the Complaint, lacks any well-pleaded facts for support, and is conclusory.

[99] *See supra* Part II.B.1.

[100] *In re BGC P'rs*, 2019 WL 4745121, at *8 (quoting *Ezcorp*, 2016 WL 301245, at *29 n.24).

pursuing litigation against Berkshire. But Berkshire is not a defendant. It was uninvolved in the challenged stock sale and is not alleged to have received any benefit from it.[101]

The plaintiffs argue that Abel and Cool could not impartially sue 3G because of Berkshire and 3G's history of co-investment, totaling $25 billion since 2013.[102] The vast majority of those investments are Kraft Heinz related: $12.4 billion from the Heinz acquisition and $10 billion from the Kraft Heinz merger.[103] The only other co-investment specified in the Complaint is Berkshire's 2014 $3 billion investment in Burger King's acquisition of Tim Horton's.[104] It cannot be reasonably inferred from these allegations that Berkshire—which had nearly $447 billion in total assets as of December 31, 2019[105]—relies on 3G to gain access to investments.[106] Even if

---

[101] *See Beam*, 845 A.2d at 1054 (explaining that the presence of a controlling stockholder "does not excuse presuit demand on the board without particularized allegations of relationships between the directors and the controlling stockholder demonstrating that the directors are beholden to the stockholder"). Like Berkshire, the controlling stockholder in *Beam* was not alleged to have engaged in a self-interested transaction. *See generally id.*; *see also Baiera*, 119 A.3d at 66.

[102] Pls.' Answering Br. 56; *see* Compl. ¶ 47.

[103] Compl. ¶ 47.

[104] *Id.* The plaintiffs also allege that "Berkshire previously owned a large stake in AB InBev" but offer no supporting details. *Id.*

[105] Stachel Decl. Ex. 1 at K-114; *see In re Gen. Motors*, 897 A.2d at 170 (permitting the court to take judicial notice of "hearsay in SEC filings" that is not subject to reasonable dispute).

[106] *See* Pls.' Answering Br. 56-57. This case is therefore different from *Sandys v. Pincus*, where two directors were found to lack independence from a controlling stockholder because they had "a mutually beneficial network of ongoing business relations with" the

it could, the necessary link to Abel and Cool is missing. There are no particularized allegations supporting a conclusion that Abel or Cool felt subject to 3G's dominion or beholden to 3G based on those investments.[107]

The plaintiffs further allege that Abel and Cool's independence was compromised given Buffett's "close relationship" with 3G co-founder Lemann.[108] According to the plaintiffs, Buffett has described Lemann as a friend, views him favorably as a business partner, attended one of his birthday parties, and joined him for three professional workshops.[109] Those facts (if true) would hardly be sufficient

---

controller that they were "not likely to risk" and because their venture capital firm operated in a space where "networks arise of repeat players who cut each other into beneficial roles in various situations." 152 A.3d at 131-34.

[107] *See Olenik v. Lodzinski,* 2018 WL 3493092, at \*18 (Del. Ch. July 20, 2018) ("Here, there are no well pled facts that allow an inference that [the director] might feel subject to [the controller's] domination (if any) because [an entity the director was CEO of] made investments (of unspecified size), spanning nearly three decades, in five [controller]-led entities."); *In re Goldman Sachs Gp., Inc. S'holder Litig.*, 2011 WL 4826104, at \*12 (finding that an allegation that a director lacked independence from Goldman because he was the CEO of an entity that had received large loans from Goldman was insufficient where the plaintiff "failed to plead facts that show anything other than a series of market transactions occurred between [the two companies]"); *Zuckerberg*, 2021 WL 4344361, at \*19 (rejecting allegation that a director who founded a company (Netflix) that did business with the controller's company (Facebook) showed a lack of independence; reasoning that "[e]ven if Netflix had purchased advertisements from Facebook, the complaint does not allege that those purchases were material to Netflix or that Netflix received anything other than arm's length terms under those agreements").

[108] Compl. ¶ 47.

[109] *Id.* Specifically, the plaintiffs allege that Buffett is beholden to Lemann because: they "have known each other since 1998 when they served together on Gillette's board of directors"; they are "longstanding friends" who have a "close relationship"; Buffett refers to Lemann as "Georgie" and has called him a "good friend" and "an absolutely outstanding human being"; "Buffett has accompanied Lemann to three workshops with Jim Collins [a

23

to show that Buffett lacks independence. His relationship with Lemann is not "suggestive of the type of very close personal relationship that, like family ties, one would expect to heavily influence a human's ability to exercise impartial judgment."[110] Allegations that individuals "moved in the same social circles," "developed business relationships before joining the board," or described each other as "friends" are insufficient, without more, to rebut the presumption of independence.[111] And one step removed from Abel and Cool, these allegations are of little consequence.[112]

---

business professor and mentor of Lemann]"; Buffett said in 2017 that "I consider it one of the largest mistakes in my life that [Lemann and I] didn't really team up as partners until considerably later"; and Buffett attended Lemann's seventy-fifth birthday party. *Id.*

[110] *Sandys*, 152 A.3d at 130. The plaintiffs rely on the Delaware Supreme Court's decision in *Sandys v. Pincus* to support their argument that Buffett lacks independence from Lemann. There, the court found that a director of was not independent from the company's controlling stockholder because the director was a "close family friend" of the controller and their families "own[ed] an airplane together." *Id.* at 129-30. The court held that "the facts support an inference that [the director] would not be able to act impartially when deciding whether to move forward with a suit implicating a very close friend with whom she and her husband co-own a private plane." *Id.* at 130-31. The plaintiffs allege no equivalent ties between Buffett and Lemann.

[111] *Beam*, 845 A.2d at 1051.

[112] *See In re KKR*, 101 A.3d at 997-98 (rejecting "transitive" independence allegations where the plaintiff's argument focused on a director's "past business relationship" with another director, who was allegedly not independent of the interested entity); *see also In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 989 (Del. Ch. 2007) (performing a director-by-director inquiry and observing that "[t]o excuse demand in this case it is not enough to show that the defendants" furthered the CEO's self-interests because the plaintiff "must provide the Court with reason to suspect that each director did so not because they felt it to be in the best interests of the company, but out of self-interest or a loyalty to, or fear of reprisal from, [the CEO]").

24

## ii.    Shareholder's Agreement

The plaintiffs also maintain that the Shareholders' Agreement would prevent Abel and Cool from exercising their independent judgment regarding a demand. According to the Complaint, the Shareholders' Agreement "prevents any of Berkshire's designees from voting to cause [Kraft Heinz] to sue 3G's designees."[113] Section 2.1(c)(ii) of the Shareholders' Agreement provides that "Berkshire . . . agrees it will not vote its Shares or take any other action to effect, encourage or facilitate the removal of any 3G Designee elected to the Board therefrom . . . without the consent of . . . 3G."[114] The plaintiffs' theory is that pursuing litigation against 3G on behalf of Kraft Heinz could "'effect, encourage or facilitate the removal' of the 3G-designated directors from the Board" under 8 *Del. C.* § 225(c).[115]

The plaintiffs seemingly waived any argument about the effect of the Shareholders' Agreement on Abel and Cool's independence after failing to advance it in their briefing.[116] In any event, the Shareholders' Agreement has little bearing on the demand futility analysis for several reasons. It did not bind Abel and Cool,

---

[113] Compl. ¶ 48.

[114] *See* Stachel Decl. Ex. 14 at F-3; *see* Compl. ¶¶ 48, 76-77.

[115] Compl. ¶ 48; *see* Pls.' Answering Br. 42.

[116] *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

25

who are not parties to it.[117] The plain language of Section 2(c)(ii) would only cause Berkshire to prevent an "Affiliate" that "hold[s] shares" from acting to facilitate the removal of a 3G Board designee. Neither Abel nor Cool fit that definition.[118] And pursuing litigation against 3G is not equivalent to automatic removal from the Board under Section 225(c). More fundamentally, there are no particularized allegations indicating that Abel or Cool would have been guided by the Shareholders' Agreement in assessing a demand to sue 3G.

Taken together, the plaintiffs' allegations are insufficient. Even when viewed in the context of the Shareholders' Agreement, Berkshire's ties to 3G cannot support a reasonable inference that either Abel or Cool is personally beholden to 3G.

### c. Cahill

John T. Cahill has served as Vice Chairman of the Board since the merger. He previously served as the CEO of Kraft and, after the merger, worked as a

---

[117] *See Huff Energy Fund, L.P. v. Gershen*, 2016 WL 5462958, at *7 (Del. Ch. Sept. 29, 2016) (holding that directors who were not parties to a shareholders' agreement were "not personally obligated to perform under the contract and cannot be held liable for breach" of the agreement).

[118] "Affiliate" is defined in the Shareholders' Agreement as a legal person "controlling, controlled by or under common control with" another legal person and "control" as "the possession directly or indirectly, of the power to direct the management and policies of a Person through the ownership of voting securities." Stachel Decl. Ex. 14 at F-1; *see* Individual Defs.' Opening Br. at 23-25. It is unclear how a Berkshire Board designee could be "controlled" under this definition and therefore be deemed an "affiliate." *See P'rs Healthcare Sols. Hldgs., L.P. v. Universal Am. Corp.*, 2015 WL 3794535, at *7, *9 (Del. Ch. June 17, 2015) (construing substantially identical definitions and concluding that they did not refer to board designees in their capacities as corporate directors).

consultant to Kraft Heinz. The plaintiffs assert that Cahill lacks independence from 3G because of (1) his consulting relationship and director compensation, (2) his status as not "independent" under Nasdaq listing standards in Kraft Heinz's 2019 proxy, and (3) his son's employment at AB InBev. Taken together, these allegations do not impugn Cahill's ability to impartially consider a demand.

First, the plaintiffs allege that Cahill lacks independence from 3G because his prior consulting compensation of $500,000 per year, coupled with his director compensation of about $235,000 per year, constituted more than half of Cahill's publicly reported income in 2018.[119] Cahill's consulting agreement with Kraft Heinz terminated on July 1, 2019—before this action was filed.[120] There are no facts alleged indicating that Cahill expected his consulting arrangement to resume.[121]

At the time the Complaint was filed, Cahill's income from Kraft Heinz was limited to standard director compensation. That compensation accounted for

---

[119] Compl. ¶ 43.

[120] *Id.*

[121] *Compare Orman*, 794 A.2d at 30 (finding consulting fees comprising director's primary employment were material where the director was beholden to a controller for "future renewals"); *Friedman v. Beningson*, 1995 WL 716762, at *1, *5 (Del. Ch. Dec. 4, 1995) (finding regular receipt of consulting fees over 12 years to be material where an interested party could affect future receipts of such fees).

roughly 17% of his publicly reported income.[122] "[D]irector compensation alone cannot create a reasonable basis to doubt a director's impartiality."[123]

Even if the court were to infer that Cahill's past consulting and director fees were material to him at that time,[124] it is not clear why they would create a sense of "owingness" to 3G.[125] Cahill had no relationship with 3G before Kraft was merged with Heinz. The Complaint lacks any particularized allegations supporting a pleading-stage inference that 3G was responsible for his directorship or consulting

---

[122] *See* Compl. ¶ 43.

[123] *Robotti & Co., LLC v. Liddell*, 2010 WL 157474, at *15 (Del. Ch. Jan. 14, 2010); *see also In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *18 (Del. Ch. Mar. 19, 2018) (noting that "even this lucrative compensation [of $548,005] would form insufficient cause to doubt [a director's] impartiality" because "[t]here [we]re no allegations that the director compensation . . . is material to [the director]").

[124] Although the Complaint alleges that the consulting agreement and director fees "together constituted more than half (52%) of Cahill's publicly reported income in 2018," the defendants argue that figure fails to contextualize this amount in view of his prior compensation as Kraft's CEO. Compl. ¶ 43; *see* Stachel Decl. Ex. 25 at 45 (SEC filings disclosing that Cahill earned several million dollars per year in 2012, 2013, and 2014); *see also McElrath v. Kalanick*, 2019 WL 1430210, at *17 (Del. Ch. Apr. 1, 2019) ("The materiality inquiry must focus on the financial circumstances or personal affinities of the particular director in question."), *aff'd*, 224 A.3d 982 (Del. 2020); *Panic*, 793 A.2d at 366 (finding it "unnecessary" to consider consulting fees paid to directors as part of an independence analysis in part because "the complaint contains no allegations of fact tending to show that the fees paid were material" to the directors).

[125] *See In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 54-55 (Del. Ch. 2013) (discussing how an investors' appointment as CEO of a company and as director to various startup boards resulted in a sense of "owingness" to the fund partners who appointed him); *In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 261 n.45 (Del. Ch. 2006) (noting that the directors at issue had "substantial past or current relationships, both of a business and of a personal nature" with the controller and that "the court can infer that each of them felt a 'sense of owingness' to their mutual patron" (internal quotation marks omitted)).

arrangement with Kraft Heinz or had the power to strip him of potential future consulting fees or his Board position.[126]

The fact that Kraft Heinz's 2019 proxy stated that the Board does not consider Cahill independent from Kraft Heinz for Nasdaq listing purposes does not change that conclusion.[127] The Delaware Supreme Court has held that "the criteria NASDAQ has articulated as bearing on independence are relevant under Delaware law," but do not "perfectly marry with the standards" applicable under Rule 23.1.[128] An independence determination under stock exchange rules "is qualitatively different from, and thus does not operate as a surrogate for, this Court's analysis of independence under Delaware law for demand futility purposes."[129] Delaware courts recognize that exchange rules, such as the criteria Nasdaq has articulated as bearing on independence, should be considered as part of a holistic demand futility

---

[126] None of the plaintiffs' control-based contentions—which focus on whether 3G owed fiduciary duties and could face *Brophy* liability—indicate otherwise. *See In re Delta & Pine Land Co. S'holders Litig.*, 2000 WL 875421, at *8 (Del. Ch. June 21, 2000) (finding demand futility not established where the plaintiff did not allege "particularized facts showing influence or control over the employment, the livelihood, or the financial interests of the directors on an individual and personal basis"); *see also Ezcorp*, 2016 WL 301245, at *37 (explaining that an ongoing consulting arrangement with the interested counterparty to challenged agreements was "not automatically disqualifying").

[127] Compl. ¶ 43.

[128] *Sandys*, 152 A.3d at 131.

[129] *Baiera,* 119 A.3d at 61; *see also Ezcorp*, 2016 WL 301245, at *36 ("The fact that a director qualifies as independent for purposes of a governing listing standard is therefore a helpful fact which, all else equal, makes it more likely that the director is independent for purposes of Delaware law.").

29

analysis.[130]  But the determination of whether Cahill is independent under Nasdaq rules concerns his independence from Kraft Heinz—not from 3G.[131]  In my view, that determination carries little weight given the dearth of particularized allegations suggesting that Cahill is beholden to 3G.[132]

The plaintiffs' final attempt to impugn Cahill's independence concerns his son's employment as a District Sales Manager at AB InBev following his completion of its "highly selective management trainee program."[133]  The plaintiffs assert that those who complete the program "*can* maintain a direct relationship with 3G founding partner Telles."[134]  That allegation is conclusory.  There are no particularized allegations tying Cahill's son's employment to 3G or suggesting that he, in fact, had a "direct relationship" with Telles.  Thus, there is no well-pleaded

---

[130] *See Sandys*, 152 A.3d at 131-33 ("The NASDAQ rules' focus on whether directors can act independently of the company or its managers has important relevance to whether they are independent for purpose of Delaware law.").

[131] Stachel Decl. Ex. 5 at 13 ("For a director to be considered independent, the Board must affirmatively determine . . . that a director has no direct or indirect material relationship with Kraft Heinz that would interfere with his or her exercise of independent judgment in carrying out his or her responsibilities as a director.").

[132] *See Baiera*, 119 A.3d at 62.  The defendants argue that Cahill was deemed not independent based on a bright-line listing rule because of his former status as a consultant.  Individual Defs.' Opening Br. 35.  That statement is unsupported by the Complaint and would require the court to draw an inference against the plaintiffs.  I decline to do so.

[133] Compl. ¶ 43.

[134] Pls.' Answering Br. 55 (emphasis added).

30

basis from which to infer that Cahill's son's employment at AB InBev would bear on Cahill's ability to assess a demand.[135]

The allegations regarding Cahill's son are insufficient to overcome his presumed independence, even when viewed holistically with the plaintiffs' other allegations. It would not be reasonable to infer that Cahill is so beholden to 3G that he would be motivated to cover up insider trading.

### d. Zoghbi and Van Damme

George Zoghbi has served on the Board since April 2018.[136] He was Kraft Heinz's Chief Operating Officer from the time of the merger until October 2017, when he became a Special Advisor.[137] The plaintiffs' arguments about Zoghbi largely overlap with those about Cahill, except that he is alleged to have received a larger consulting fee, which was ongoing as of July 2019 and accounts for a comparatively greater percentage of his income.[138] Whether Zoghbi is independent of 3G is therefore a closer call than Cahill.

---

[135] *See Cal. Pub. Empls.' Ret. Sys. v. Coulter*, 2002 WL 31888343, at *9 (Del. Ch. Dec. 18, 2002) (finding allegations that a director's son's "livelihood [wa]s dependent" on the interested party were insufficient to raise a reasonable doubt as to the director's independence).

[136] Compl. ¶ 44.

[137] *Id.*

[138] *Id.*

Alexandre Van Damme has also served on the Board since April 2018.[139]  The Complaint describes Van Damme as immersed in an "intricate web of personal, professional and financial ties to 3G and its principals."[140]  The particularized allegations that make up that web, taken as true and in their totality, come closest to supporting a reasonable doubt about a non-3G director's ability to objectively consider a demand.

Because this decision has already found that six of the Demand Board's eleven directors were able to consider a demand impartially, I need not resolve whether Zoghbi or Van Damme are independent.

## III. CONCLUSION

The plaintiffs have failed to plead particularized facts creating a reasonable doubt that six of the eleven Demand Board members lack independence from 3G or its defendant partners.  The plaintiffs have conceded the independence of Jackson and Pope.  Abel and Cool do not lack independence from 3G based on their ties to Berkshire.  And the plaintiff's allegations about Cahill and Dewan do not, in totality, impugn their independence from 3G.  Accordingly, demand is not excused.

The defendants' motions to dismiss the Complaint pursuant to Rule 23.1 are granted.  The Complaint is dismissed with prejudice in its entirety.

---

[139] *Id.* ¶ 45.

[140] *Id.*